IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| NIGEL POTTER; | : | CR 03-81-01ML |
| DANIEL BUCCI; and | : | (Superseding Indictment) |
| BURRILLVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK | : | |
| a/k/a LINCOLN GREYHOUND PARK | : | |
| a/k/a LINCOLN PARK, INC. | : | |

**DEFENDANTS NIGEL POTTER'S, DANIEL BUCCI'S AND LINCOLN PARK, INC.'S MOTION FOR RECONSIDERATION OF DECISION TO EXCLUDE POTTER EXHIBIT JJ (BUCCI EXHIBIT A), POTTER EXHIBIT KK (BUCCI EXHIBIT B), AND BUCCI EXHIBIT C**

Defendants jointly move for this Court to reconsider its decision to exclude Potter Exhibit JJ (Bucci Exhibit A), Potter Exhibit KK (Bucci Exhibit B), and Bucci Exhibit C. These documents are admissible on multiple grounds and are essential to a reasoned assessment of this case.

Defendants state their reasons more thoroughly in the accompanying memorandum of law.

Respectfully submitted,
NIGEL POTTER
By his Attorneys,

C. LEONARD O'BRIEN, ESQ. (#1886)
B. JEAN ROSIELLO, ESQ. (#2886)
MacFadyen, Gescheidt and O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903

Respectfully submitted,
DANIEL BUCCI
By his Attorney,

Anthony Traini (E.T.)

ANTHONY M. TRAINI (#4793)
56 Pine Street
Providence, RI 02903

Respectfully submitted,
LINCOLN PARK, INC.
By its Attorneys,

John Tarantino (E.T.)

JOHN A. TARANTINO (#2586)
PATRICIA K. ROCHA (#2793)
Adler, Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

CERTIFICATE OF SERVICE

I certify that on the 25th day of July, 2005 I caused a copy of this document to be hand-delivered to Craig N. Moore and Lee H. Vilker, Assistant United States Attorneys, The Fleet Center, 50 Kennedy Plaza, 8th Fl., Providence, RI 02903.

[signature]

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| NIGEL POTTER; | : | CR 03-81-01ML |
| DANIEL BUCCI; and | : | (Superseding Indictment) |
| BURRILLVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK | : | |
| a/k/a LINCOLN GREYHOUND PARK | : | |
| a/k/a LINCOLN PARK, INC. | : | |

**DEFENDANTS NIGEL POTTER'S, DANIEL BUCCI'S AND LINCOLN PARK, INC.'S JOINT MEMORANDUM IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION OF DECISION TO EXCLUDE POTTER EXHIBIT JJ (BUCCI EXHIBIT A), POTTER EXHIBIT KK (BUCCI EXHIBIT B), AND BUCCI EXHIBIT C**

Defendants have jointly moved that this Court reconsider its decision to exclude from evidence Potter Exhibit JJ (Bucci Exhibit A) (P-JJ/B-A), Potter Exhibit KK (Bucci Exhibit B) (P-KK/B-B), and Bucci Exhibit C (B-C). These documents are admissible both as non-hearsay to show that the information was in fact communicated by Daniel Bucci to Skip Sherman, and to show Mr. Bucci's non-felonious state of mind under F.R.Evid. 803(3).

**Non-Hearsay**

The government's theory, as stated in its opening, is that Daniel Bucci and Nigel Potter schemed to cut Denver out of the loop so that illicit checks could be cut to Mr. McKinnon once Mr. Potter had $600,000 put in the Wembley USA budget. The evidence presented thus far shows that Skip Sherman and David Brents were against the idea and that they alone, among Wembley USA personnel, had authority to approve checks of the amount necessary to pay the

McKinnon proposal. The evidence also shows that the reorganization included a plan for Wembley plc to hire a Finance Director for Lincoln Park.

The government's theory cannot prevail under such circumstances unless it proves that the alleged scheme included some method of preventing Skip Sherman and David Brents from interfering with any illicit 2001 McKinnon payments by refusing to issue checks. P-JJ, P-KK and B-C constitute strong circumstantial evidence that Mr. Bucci did not contemplate any plan to interfere with Mr. Sherman's and Mr. Brents' financial control – to the contrary, they indicate he welcomed it. These exhibits show, by inference, that he had no agreement to that effect with Mr. Potter.

P-JJ is circumstantial evidence that Mr. Bucci did not want any change in the relationship between Lincoln Park and Denver *a propos* of finances, and that Mr. Bucci wanted to keep Mr. Sherman *in* the loop on the issue. Thus, in P-JJ, Mr. Bucci shares with Mr. Sherman his feeling that the hiring of a Finance Director for Lincoln Park is something that "'obviously falls in the 'it's not broken, why fix it category[.]'"

P-KK again shows Mr. Bucci keeping Mr. Sherman abreast about financial relations between Lincoln Park and Denver, this time assuring him that the new Finance Director's job description will not alter the processing of Lincoln Park accounts in Denver. The actual content of the CFO's job description is not the issue. The issue is Mr. Bucci's reaction to what he understood this job description to say. And his reaction – the sending of this fax – is circumstantial evidence that he was perfectly happy to keep Denver in charge of the finances. He evidenced that attitude by sharing the job description with Skip Sherman, who he wanted to keep control, rather than by complaining about his continuing authority to Mr. Potter.

In fact, as B-C shows, Mr. Bucci not only did not complain to London. He "prodded" Mark Elliott to keep Denver in charge. In B-C, Mr. Bucci gives Mr. Sherman "the skinny" about how Mark Elliott needed "very little prod[d]ing ... he likes the status quo, i.e., me to you, with him overseeing things." (emphasis original). Mr. Bucci's fax concludes that "I was pleased that he seemed so quick to relinquish the reins back ..." Mr. Bucci's desire to keep the "status quo" on finances is inconsistent with the government's theory that Nigel Potter and Dan Bucci were scheming to take control of the finances in order to facilitate the payment of a bribe to which Skip Sherman and David Brents in Denver had objected.

In sum, each one of these three exhibits is significant to this case simply because they were, in fact, written by Daniel Bucci to Skip Sherman on the indicated dates. Collectively, they show that, right in the middle of the alleged conspiracy and scheme to defraud, Mr. Bucci was communicating directly with a person – Skip Sherman – who he knew opposed his McKinnon bonus idea about the proposed evolution of fiscal oversight of Lincoln Park. If Mr. Bucci and Mr. Potter had been engaged in a conspiracy or scheme to defraud, you would expect to see Mr. Bucci communicating directly with Mr. Potter, perhaps working out ways that checks might be cut without anyone's oversight. Instead, he was updating Mr. Sherman – a man who he knew opposed his McKinnon proposal – on efforts to maintain effective fiscal oversight. These communications are substantial evidence that Mr. Bucci was not acting as a conspirator or schemer as of the dates they were written, January 19, 2001 and February 13, 2001.

Second, and allied to the first, these documents are admissible as impeachment of testimony from Mr. Sherman that he was being cut out of the loop. During direct examination, the government went to great pains to establish that the communications between Mr. Bucci and Mr. Sherman diminished toward the end of 2000 and in 2001, and further, that Mr. Sherman was

not receiving key information which was being delivered directly to Mr. Potter. These exhibits impeach that testimony by showing that on a critical issue, the continued fiscal oversight of Lincoln Park, Mr. Bucci continued to keep Mr. Sherman informed of developments. For this reason alone, they should be admitted into evidence.

**Rule 803(3)**

In addition to these non-hearsay rationales for admission, these exhibits are also admissible under Rule 803(3) as contemporaneous evidence of Mr. Bucci's non-felonious state of mind. Taken collectively, they show that Mr. Bucci desired Skip Sherman to continue to oversee the fiscal affairs of Lincoln Park. As such, they are highly exculpatory because this desire contradicts a key tenet of this prosecution, which is that Mr. Potter and Mr. Bucci schemed to create a system whereby checks could be cut to Mr. McKinnon without the knowledge of other persons in the organization.

Thus, in P-JJ/B-A, Mr. Bucci complains to Mr. Sherman and Mr. Brents about any change in the fiscal status quo, as noted *supra* at p. 2: "This obviously falls in the 'it's not broken, why fix it category[.]'" In P-KK/B-B, written only an hour later, he follows up with the information that apparently the CFO of Wembley USA (David Brents) will retain responsibility for most of the "accounts processing for L.P." And in B-C, Mr. Bucci discusses how Mark Elliott appears to be comfortable in maintaining Colorado's fiscal oversight and explicitly states that he (Bucci) is happy about this: "I was pleased that he seems so quick to relinquish the reins back ..."

All of these communications take place during a period of time in which the government asserts Mr. Bucci was attempting to orchestrate illegal payments to Mr. McKinnon in a manner which would confound fiscal oversight. These fax communications are direct evidence that,

during this period of time, he had no such intention. As such, they are not just important to the defense; they are essential.[1]

**Rule of Completeness**

P-JJ/B-A, P-KK/B-B, and B-C are admissible for an additional and independent reason: the rule of completeness. The government has introduced over defense objection G-107, a fax from Mr. Bucci to Mr. Elliott on April 2, 2001. It did so to augment its argument that Mr. Bucci wanted to keep Denver out of the loop: "I don't want Denver to know our business." P-JJ/B-A, P-KK/B-B, and B-C , however, significantly moderate this flat statement. They establish that Mr. Bucci's true intention was substantially different and considerably less suggestive than G-107 would suggest.

The rule of completeness operates to require the admission, not only of additional portions of a single document which balance or give context to a particular statement sought to be admitted, but other documents which in fairness must be considered with the proffered document. *See,* F.R.Evid. 106 ("When a writing ... is introduced by a party, an adverse party may require the introduction at that time of any other part *or any other writing* ... which ought in fairness to be considered contemporaneously with it"). Hence, the Supreme Court's admonition in *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170-72 (1988) is pertinent here: "When one party had made use of a portion of a document, such that misunderstanding or distortion can be

---

[1] This state of mind evidence is exculpatory as to Mr. Potter as well as Mr. Bucci. The *Amended Superseding Indictment* claims that Mr. Bucci and Mr. Potter are the only two alleged conspirators. Under the rule of consistency, Mr. Potter cannot be convicted of conspiracy if Mr. Bucci is acquitted. Hence, evidence which undermines the government's case against Mr. Bucci simultaneously serves to undermine its case against Mr. Potter.

Further, as a practical proposition, if evidence serves to give the jury doubts as to Mr. Bucci, the alleged architect of the charged scheme to defraud, then these same doubts will very likely undermine the government's case against Mr. Potter.

averted only through presentation of another portion, the material required for completeness is ipso facto relevant and therefore admissible under Rules 401 and 402."

The Bucci faxes are an ongoing stream of communications. The government must not be permitted to cherry-pick those which support its case and hide from the jury those which rebut it. Without being able to consider P-JJ/B-A, P-KK/B-B, and B-C, the jury will be given a one-sided and inaccurate view of Mr. Bucci's activities and intentions which are at the very heart of this case.

**Conclusion**

P-JJ/B-A, P-KK/B-B, and B-C are essential to a reasoned consideration of the facts in this case and should be admitted into evidence.

Respectfully submitted,
NIGEL POTTER
By his Attorneys,

C. LEONARD O'BRIEN, ESQ. (#1886)
B. JEAN ROSIELLO, ESQ. (#2886)
MacFadyen, Gescheidt and O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903

Respectfully submitted,
DANIEL BUCCI
By his Attorney,

ANTHONY M. TRAINI (#4793)
56 Pine Street
Providence, RI 02903

Respectfully submitted,
LINCOLN PARK, INC.
By its Attorneys,

John Tarantino (E.T.)

JOHN A. TARANTINO (#2586)
PATRICIA K. ROCHA (#2793)
Adler, Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

CERTIFICATE OF SERVICE

I certify that on the 25th day of July, 2005 I caused a copy of this document to be hand-delivered to Craig N. Moore and Lee H. Vilker, Assistant United States Attorneys, The Fleet Center, 50 Kennedy Plaza, 8th Fl., Providence, RI 02903.