IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
) CR. No. 03-081ML
v. )
)
NIGEL POTTER; )
DANIEL BUCCI; and )
BURRILLVILLE RACING ASSOCIATION )
a/k/a LINCOLN PARK )
a/k/a LINCOLN GREYHOUND PARK, )
a/k/a LINCOLN PARK, INC. )

**AMENDED SUPERSEDING INDICTMENT**

The Grand Jury charges:

At all times material to this Indictment:

1. Wembley PLC was a British public limited company headquartered in the United Kingdom. Its principal business was that of track-based gambling in the United Kingdom and in the United States of America. It owned a number of subsidiary corporations in the United States, including Wembley USA, Inc. (hereinafter referred to as Wembley USA) and BURRILLVILLE RACING ASSOCIATION, a/k/a LINCOLN PARK, a/k/a LINCOLN GREYHOUND PARK, a/k/a LINCOLN PARK, INC. (hereinafter referred to as LINCOLN PARK).

2. Wembley USA was a United States corporation which had its principal place of business in Colorado. For part of the time material to this Indictment, Wembley USA controlled Defendant LINCOLN PARK.

3. Defendant LINCOLN PARK was a United States corporation incorporated in the State of Rhode Island with its principal place of business located in Lincoln, Rhode Island. It provided a dog track, simulcast, and video lottery terminals (VLTs), also referred to as machines, to the public. It was licensed by the State of Rhode Island and was regulated by the Rhode Island Lottery Commission. Its name was formally changed from BURRILLVILLE RACING ASSOCIATION to LINCOLN PARK, INC. on or about March 21, 2003.

4. Defendant NIGEL POTTER was the Chief Executive Officer of Wembley PLC and was a member of the Board of Directors of Wembley PLC, Wembley USA, and Defendant LINCOLN PARK.

5. Defendant DANIEL BUCCI held various positions with Defendant LINCOLN PARK, including General Manager, Chief Executive Officer, and Vice President.

6. The Rhode Island Lottery Commission consisted of nine members; three of whom were appointed by the Rhode Island Speaker of the House of Representatives; three of whom were appointed by the Majority Leader (now called President) of the Rhode Island Senate; and three of whom were appointed by the Governor of the State of Rhode Island. The Rhode Island Lottery Commission regulated the number and operation of VLTs, sometimes referred to as machines, in Defendant LINCOLN PARK. The Rhode Island Lottery Commission had the authority to authorize an increase or require a decrease in the number of VLTs at Defendant LINCOLN PARK.

7. McKinnon & Harwood was a law firm partnership which performed legal services for Defendant LINCOLN PARK.

8. John B. Harwood was one of the two principal partners in the law firm of McKinnon & Harwood. John B. Harwood was also a public official and served as Speaker of the Rhode Island House of Representatives.

9. Daniel V. McKinnon was a principal partner in the law firm of McKinnon & Harwood. He was not a registered lobbyist for Defendant LINCOLN PARK.

10. The Narragansett Indian Tribe was seeking Rhode Island Legislative support to own and operate a gambling casino in Rhode Island.

## COUNT I

11. The Grand Jury realleges and incorporates by reference paragraphs 1 through 10 of this Indictment as though fully set forth herein.

12. Beginning in or about March, 2000, and continuing at least until in or about April 2001, in the Districts of Rhode Island and Colorado, in the United Kingdom, and elsewhere, the Defendants, NIGEL POTTER, DANIEL BUCCI, and LINCOLN PARK, knowingly, wilfully, and unlawfully combined, conspired, confederated, and agreed with each other to commit an offense against the United States, specifically, having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right of the honest services of John B. Harwood, and for the purpose of executing that scheme and artifice, to transmit and cause to be transmitted in interstate and foreign commerce by means of wire communication, certain writings, signs, and signals, according to the directions thereon, that is, by facsimile transmission, in violation of 18 U.S.C. §§ 1343 and 1346.

13. It was the purpose, intent and object of the conspiracy to pay money to the law firm of McKinnon & Harwood over a period of years so as to improperly influence and affect the official action of John B. Harwood, specifically, to cause him to use his influence, appointment power, and authority:

a. to obtain Rhode Island Lottery Commission authorization for the installation of in excess of 1,000 additional VLTs at Defendant LINCOLN PARK;

b. to obtain Rhode Island Lottery Commission authorization for the installation of coin-operated slot machines at Defendant LINCOLN PARK; and

c. to prevent legislation facilitating the development of a Narragansett Indian Tribe gambling casino in the State of Rhode Island.

It was the further purpose, intent and object of the conspiracy to deceive the public as to the true nature of this payment by describing it as a legitimate payment to the law firm of McKinnon & Harwood for legal services when, in fact, the payment was intended as a bribe, euphemistically referred to as a "reward", "bonus", "retainer", "incentive", "payment", or "arrangement" to John B. Harwood to obtain favorable Lottery Commission and Legislative action for Defendant LINCOLN PARK.

Overt Acts

In furtherance of the conspiracy and to accomplish its objectives and purposes, at least one of the following Overt Acts, among others, was committed by one or more of the co-conspirators in the District of Rhode Island and elsewhere:

14. On or about October 5, 2000, Defendant DANIEL BUCCI sent a facsimile transmission from Rhode Island via interstate and foreign commerce to Wembley USA in Colorado. Defendant BUCCI stated, among other things, that the law firm of McKinnon & Harwood should be given a "six-figure check" to further the goal of receiving permission to install coin-operated slot machines and additional VLTs.

15. On or about November 29, and November 30, 2000, Defendants NIGEL POTTER and DANIEL BUCCI met in Rhode Island to discuss the payment of a "retainer" to McKinnon & Harwood.

16. On or about December 1, 2000, Defendant NIGEL POTTER sent a facsimile transmission from the United Kingdom via interstate and foreign commerce to Defendant DANIEL BUCCI in Rhode Island. Defendant POTTER endorsed Defendant DANIEL BUCCI's strategy to attempt to obtain Lottery Commission authorization for an additional 1,000 to 1,500 VLTs during 2001 for implementation in 2002 and to pay the law firm of McKinnon & Harwood a "retainer" of $500,000 per year for 2001 and 2002. Defendant NIGEL POTTER indicated that he and others would consider increasing the retainer to $1,000,000 per year for the years 2003, 2004 and 2005 for McKinnon & Harwood if 1,000 or more machines were implemented in 2002. Defendant NIGEL POTTER further indicated that if no additional machines were authorized, the $500,000 per annum for the years 2001 and 2002 would cease.

17. On or about December 1, 2000, Defendant DANIEL BUCCI sent a facsimile transmission from Rhode Island via interstate and foreign commerce to Defendant NIGEL POTTER in the United Kingdom. Defendant BUCCI suggested that, unless an "incentive" were given to McKinnon & Harwood, Defendant LINCOLN PARK might be granted additional machines in 2002, but the Narragansett Indian Tribe might also receive a casino license. Defendant DANIEL BUCCI stated his understanding that Defendant NIGEL POTTER had agreed to increase the reward to $1 million to McKinnon & Harwood at once if Defendant LINCOLN PARK received approval for 1,000 or more machines.

18. On or about December 4, 2000, Defendant NIGEL POTTER sent a facsimile transmission from the United Kingdom via interstate and foreign commerce to Defendant DANIEL BUCCI in Rhode Island. Defendant POTTER stated that he would "bring forward McKinnon's reward" if Defendant LINCOLN PARK received the authorization for 1,000 or more machines, but only after the machines were installed and generating revenue. Defendant POTTER informed Defendant BUCCI, however, that "I think we are speaking the same language."

19. On or about December 5, 2000, Defendant DANIEL BUCCI sent a facsimile transmission from Rhode Island via interstate and foreign commerce to Defendant NIGEL POTTER in the United Kingdom. Defendant BUCCI stated that unless an "incentive" were given to "McKinnon's office," the chances to achieve extra machines in 2001 were "MINIMAL AT BEST".

20. On or about December 6, 2000, Defendant NIGEL POTTER sent a facsimile transmission from the United Kingdom via interstate and foreign commerce to Defendant DANIEL BUCCI in Rhode Island indicating that he and Defendant DANIEL BUCCI needed to "chat" about Defendant DANIEL BUCCI's recent facsimile regarding Daniel V. McKinnon.

21. On or about December 7, 2000, Defendant NIGEL POTTER sent a facsimile transmission from the United Kingdom via interstate and foreign commerce to Defendant DANIEL BUCCI in Rhode Island. Defendant POTTER suggested that he and Defendant BUCCI were not "so far adrift on the strategy for extra machines." Defendant POTTER also stated that Defendant BUCCI might give Defendant POTTER "a proposal . . . not only in terms of the cash payment but also . . . defining precisely what we are expecting . . . in exchange."

22. On or about December 11, 2000, Defendant DANIEL BUCCI sent a facsimile transmission from Rhode Island via interstate and foreign commerce to Defendant NIGEL POTTER in the United Kingdom. Defendant BUCCI stated his understanding that the law firm of McKinnon & Harwood would receive 12 monthly payments of $41,666 each for calendar year 2001 and that Defendant NIGEL POTTER would resolve the question of when the rate would double, if more than 1,000 additional machines were authorized.

23. On or about December 12, 2000, Defendant NIGEL POTTER sent a facsimile transmission from the United Kingdom via interstate and foreign commerce to Defendant DANIEL BUCCI in Rhode Island. Defendant POTTER stated that he was "happy that the McKinnon payments are as we agreed when we met, and which you reiterated to me in your note of last Friday, i.e. $500,000 a year in 2001 and 2002, followed by $1 million a year for the next 3 years (or sooner if machines were installed prior to 31/12/2002), subject to the receipt of

permission to install at least 1,000 extra VLT or slot machines."

24. On or about January 12, 2001, Defendant POTTER attended a meeting of the Wembley PLC Board of Directors at which the Board approved the Wembley PLC consolidated budget, including a total payment to McKinnon & Harwood of $600,000 for 2001, about $500,000 more than the firm had billed Defendant LINCOLN PARK in previous years.

25. On or about January 24, 2001, Defendant NIGEL POTTER advised the Wembley USA Board of Directors that Wembley PLC had approved payments to Daniel V. McKinnon of approximately $4,000,000 more or less over a six year period.

26. On or about March 8, 2001, Defendant DANIEL BUCCI sent a facsimile transmission from Rhode Island via interstate and foreign commerce to two people at Wembley PLC in the United Kingdom. Defendant DANIEL BUCCI indicated that John B. Harwood was the most powerful politician in Rhode Island and that much of Defendant LINCOLN PARK's "political success" was attributable to the law firm of McKinnon & Harwood. Defendant DANIEL BUCCI further indicated that "a $1 million retainer for four years, without strings; sends a clear message of gratitude and a willingness to share its success".

27. On or about March 14, 2001, an offer of a multi-year payment to the law firm of McKinnon & Harwood was made.

28. On or about March 15, 2001, Defendant DANIEL BUCCI sent a facsimile transmission from Rhode Island via interstate and foreign commerce to two people at Wembley PLC in the United Kingdom. Defendant BUCCI stated that, while Daniel V. McKinnon was "touched by the offer," he would not accept a "multi-year arrangement." Defendant BUCCI stated, however, that Daniel V. McKinnon might accept a one year "arrangement" in which McKinnon & Harwood would submit "12 [monthly] invoices [to Defendant LINCOLN PARK for] 1/8th [sic] of 1 M, each."

All in violation of 18 U.S.C. § 371.

COUNTS II THROUGH XII

29. The Grand Jury realleges and incorporates by reference paragraphs 1 through 10.

30. The Grand Jury further charges that Defendants, NIGEL POTTER, DANIEL BUCCI, and LINCOLN PARK, devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right of the honest services of John B. Harwood by paying money to the law firm of McKinnon & Harwood over a period of years so as to improperly influence and affect the official action of John B. Harwood, specifically, to cause him to use his influence, appointment power, and authority:

a. to obtain Rhode Island Lottery Commission authorization for the installation of in excess of 1,000 additional VLTs at Defendant LINCOLN PARK;

b. to obtain Rhode Island Lottery Commission authorization for the installation of coin-operated slot machines at Defendant LINCOLN PARK; and

c. to prevent legislation facilitating the development of a Narragansett Indian Tribe gambling casino in the State of Rhode Island.

It was the further purpose, intent, and object of the scheme and artifice to defraud, to deceive the public as to the true nature of this payment by describing it as a legitimate payment to the law firm of McKinnon & Harwood for legal services when, in fact, the payment was intended as a bribe, euphemistically referred to as a "reward", "bonus", "retainer", "incentive", "payment", or "arrangement" to John B. Harwood.

31. On or about the dates indicated below with respect to the corresponding Count of this Indictment, in the District of Rhode Island and elsewhere, for the purpose of executing the foregoing scheme and artifice to defraud, the Defendant(s) named in each Count below did knowingly transmit and cause to be transmitted in interstate and foreign commerce by means of wire communication, certain writings, signs, and signals, according to the directions thereon, that is, by facsimile transmission, the following communications:

| COUNT | DEFENDANT/ SENDER | DATE (ON OR ABOUT) | RECIPIENT | FACSIMILE COMMUNICATION |
|---|---|---|---|---|
| II | DANIEL BUCCI | 10/05/2000 | WEMBLEY USA | described in paragraph 14 |
| III | NIGEL POTTER | 12/01/2000 | DANIEL BUCCI | described in paragraph 16 |
| IV | DANIEL BUCCI | 12/01/2000 | NIGEL POTTER | described in paragraph 17 |
| V | NIGEL POTTER | 12/04/2000 | DANIEL BUCCI | described in paragraph 18 |
| VI | DANIEL BUCCI LINCOLN PARK | 12/05/2000 | NIGEL POTTER | described in paragraph 19 |
| VII | NIGEL POTTER | 12/06/2000 | DANIEL BUCCI | described in paragraph 20 |
| VIII | NIGEL POTTER | 12/07/2000 | DANIEL BUCCI | described in paragraph 21 |
| IX | DANIEL BUCCI LINCOLN PARK | 12/11/2000 | NIGEL POTTER | described in paragraph 22 |
| X | NIGEL POTTER | 12/12/2000 | DANIEL BUCCI | described in paragraph 23 |
| XI | DANIEL BUCCI LINCOLN PARK | 03/08/2001 | WEMBLEY PLC | described in paragraph 26 |
| XII | DANIEL BUCCI LINCOLN PARK | 03/15/2001 | WEMBLEY PLC | described in paragraph 28 |

Each Count in violation of 18 U.S.C. §§ 1343 and 1346.

A TRUE BILL:

____________________________
GRAND JURY FOREPERSON

ROBERT CLARK CORRENTE
United States Attorney

____________________________
CRAIG N. MOORE
First Assistant U.S. Attorney

____________________________
LEE H. VILKER
Assistant United States Attorney

DATE FILED: ____________________