UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No.: CR03-81-03ML |
| | : | (Amended Superseding Indictment) |
| NIGEL POTTER; | : | |
| DANIEL BUCCI; and | : | |
| BURRILLVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK, | : | |
| a/k/a LINCOLN GREYHOUND PARK, | : | |
| a/k/a LINCOLN PARK, INC. | : | |

**DEFENDANTS' JOINT MOTION FOR NEW TRIAL**

Defendants, Nigel Potter, Daniel Bucci and Lincoln Park, Inc.[1], hereby move pursuant to Federal Rule of Criminal Procedure 33(a) that the Court grant them a new trial as the interest of justice so requires. For grounds of their motion, Defendants rely on their Memorandum of Law which is filed herewith.

**Request for Oral Argument**

Defendants request oral argument on their Motion for New Trial and anticipate that argument will take one hour.

Dated: August 15, 2005

Respectfully submitted,

DANIEL BUCCI,
By his Attorney,

Anthony M. Traini (#4793)
56 Pine Street - Suite 2
Providence, RI 02903
Tel. 401.621.4700
Fax 401.621.5888

[1] On July 18, 2005, Lincoln Park, Inc. was merged into LPRI, LLC. A copy of the Stipulation noting this fact is attached as Exhibit 1. For purposes of clarity and consistency, however, in this motion the name Lincoln Park will be used.

NIGEL POTTER,
By his Attorney,

/s/ C. Leonard O'Brien
C. Leonard O'Brien (#1886)
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903
Tel. 401.751.5090
Fax 401.751.5096

LINCOLN PARK, INC.,
By its Attorneys,

John A. Tarantino
John A. Tarantino (#2586)
Patricia K. Rocha (#2793)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel. 401.274.7200
Fax 401.351.4607

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2005, I served a copy of the foregoing pleading by ~~mail~~/hand delivery, upon Craig N. Moore, Esquire, and Lee H. Vilker, Esquire, Assistant United States Attorneys, United States Attorney's Office, The Fleet Center, 50 Kennedy Plaza, Providence, RI 02903.

Debra Hurn

*342205_1.doc*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No.: CR03-81ML |
| | : | |
| NIGEL POTTER; | : | |
| DANIEL BUCCI; and | : | |
| BURRILLVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK, | : | |
| a/k/a LINCOLN GREYHOUND PARK, | : | |
| a/k/a LINCOLN PARK, INC. | : | |

**STIPULATION**

It is hereby stipulated that on July 18, 2005, the Defendant corporation, Lincoln Park, Inc., was merged into LPRI, LLC, a Rhode Island limited liability company.

Dated: August 3, 2005

CRAIG N. MOORE
LEE H. VILKER
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
*Attorneys for United States of America*

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
*Attorneys for Lincoln Park*

C. LEONARD O'BRIEN, #1886
B. JEAN ROSIELLO, #2886
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903
*Attorneys for Nigel Potter*

ANTHONY M. TRAINI, #4793
56 Pine Street
Providence, RI 02903
*Attorney for Daniel Bucci*

340874_1.doc

[redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| VS. | : | CR. No. 03-81 ML (Superseding) |
| | : | |
| NIGEL POTTER; | : | |
| DANIEL BUCCI; and | : | |
| BURRIVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK | : | |
| a/k/a LINCOLN GREYHOUND PARK | : | |
| a/k/a LINCOLN PARK, INC. | : | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR NEW TRIAL

Defendants Nigel Potter, Daniel Bucci and Lincoln Park, Inc. ("Lincoln Park"), have moved this Honorable Court for a new trial. In support of their motion the defendants respectfully submit the following:

## PART ONE

## I. The Facts.

On Friday, August 5, 2005, following closing arguments, Defendants filed a Motion for Appropriate Relief seeking alternatively judgments of acquittal or a new trial based upon an incident that had occurred on Thursday, August 4, during the government's rebuttal argument.[1]

On Thursday, August 4, 2005, defense counsel for Mr. Bucci and Lincoln Park presented their closing arguments to the jury. During their respective arguments, defense counsel argued, among other things, that the government had failed to introduce evidence to support certain elements of the offenses on which defense counsel knew the Court would later instruct the jury.[2]

[1]The Motion For Appropriate Relief filed in open Court on August 5 is incorporated herein by reference.

[2]These issues were the same ones that defense counsel had argued in their Rule 29 motions (Tr., 8/2/05 at 199:16-209:6; 215:5-217:4), as well as in their request to strike allegations (specifically paragraphs 6, 13 and 31) (Tr.,

In his rebuttal argument immediately following these two defense closings, the prosecutor impermissibly expressed the position that he had not presented to the jury during the trial all the evidence available to the government, either because of his failure to do so or perhaps because the Court may not have admitted some additional evidence the government offered.[3] The statement of the prosecutor, as appearing in the official version of the transcript, is as follows:

---

8/2/05, at 175:13-176:25; 187:19-189:19; 196:6-197:6) from the indictment, on Tuesday, August 2. Those issues were critical to the government's case, and defense counsel advised the Court that they would also be issues for the jury in the context of Court's proposed Jury Instructions 33 and 34, both of which were actually given to the jury on August 4 (Tr., 8/4/05, at 116:21-117:9).

[3]Although there is a discrepancy in the transcript concerning exactly what the prosecutor said, the official version of his remarks unequivocally warrants the relief requested here. The Defendants include the information that follows because in the event the Court disagrees with the defense position that the prosecutor's statements as reported in the official version of the transcript are sufficient to warrant a new trial, the discrepancy in the transcript will become an issue for determination by this Court in the first instance, and if necessary by the Court of Appeals. In connection with this potential additional review, counsel have submitted as attachments to this motion their individual affidavits as to what they heard in the courtroom during the government's rebuttal argument.

Indeed, various portions of the official transcript bear out that the remarks were as defense counsel heard them rather than as the transcript reports in one portion of the official version as quoted above (i.e., on page 73). The statement by the prosecutor, as made in open court and contemporaneously transcribed in so-called "real-time," was as follows:

> If something is missing, if something isn't perfect, blame me. The Government is not perfect. I may not be perfect. Maybe it could have been done better. ***Maybe there could have been something that I could have given you. Maybe there's something I could have given you or maybe something I could have brought in that the Court would have allowed, that the Court didn't let come in***. (Emphasis supplied) (Tr., 8/4/05 at 89:15-24).

The two versions in the same transcript (the official version as appearing on page 73:7-13 and the "real- time" version read from the screen by counsel as appearing on page 89:15-24) differ in the omission from the official version of the seven words at the very end of the real-time version: "that the Court didn't let come in." (89:23-24). All defense counsel heard this additional use of the word "Court" a second time, and all recall the prosecutor's reference to evidence that the "Court didn't let come in." See also, attached affidavits of counsel, Exhibits 1-6. The Court's comments at this time also support the defense position as the Court stated the prosecutor was referring to evidence that she excluded (Tr., 8/4/05 at 86:6-8).

Immediately upon the conclusion of the government's rebuttal argument and before the Court began its final instructions, defense counsel approached and brought this offending conduct to the Court's attention. Defense counsel for Mr. Bucci:

> Your Honor, as you know, the Government—at the beginning of Mr. Moore's rebuttal, he made a statement that sounded to me like he was commenting on ***other evidence that might have been available and that either he didn't put in or you wouldn't let come into this case.*** (Emphasis supplied) (Tr. 8/4/05, at 84:25 through 85:1-5).

> If something's missing, if something isn't perfect, blame me. The Government's not perfect. I'm not perfect. Maybe it could have been done better. ***Maybe there could have been something that I could have given you, brought in here. Maybe I could have brought something in that the Court would have allowed in that didn't come in***. (Emphasis supplied) (Tr., 8/4/05 at 73:7-13).

In objecting to the defense request for mistrial and also to any curative instruction, and in attempting to defend his position, the prosecutor told the Court that he was responding to defense counsels' arguments concerning the absence of evidence and then said:

> And I specifically put it in the context of if this case isn't perfect, if it's not everything you want, blame me. ***Who knows, maybe there is something out there.*** Maybe the— " (Emphasis supplied) (Tr., 8/4/05, at 88:9-12).

The Court immediately interrupted with the comment "I'm concerned about inviting them to think about what else might be out there." (Id., at 88:13-14). The Court then gave a curative instruction, which, the defense respectfully submits, did not (nor could it) adequately address the grievance:[4]

---

Counsel also began to explain the connection that the prosecutor's improper statement had to certain items of evidence that the defense had sought to introduce during the trial. In distinguishing that issue, the Court acknowledged the offense when she responded: "I didn't take it as to those items. ***I thought it was to the evidence that I excluded that the Government—***" (Emphasis supplied) (Tr., 8/4/05, at 86:6-8) [The Court was interrupted at this point.]

On Friday, August 5, defense counsel sought to listen to the tape recording of the courtroom proceeding during which the rebuttal argument was given, and eventually were allowed to do so. The tape as played, was consistent with the version of the prosecutor's statement as reported in the official version (i.e., at transcript page 73). Counsel cannot explain the discrepancy, but believe that there may have been a malfunction in the courtroom recording equipment, particularly because counsel acknowledge the extraordinary level of expertise of the court stenographer. Defense counsel suggest that it is highly unlikely that she would have typed in "real time" seven words that she never heard spoken at all.

In order to preserve this issue properly for review by this Court if necessary, and/or for appellate review, the Defendants respectfully request that the Court segregate the tape(s) of the August 4 proceedings from the other tapes of the trial proceedings and keep them sealed and attached as exhibits to this Motion so that they can be heard and reviewed by the Court or, if necessary and appropriate, subjected to analysis to determine if, in fact, there was a malfunction in the recording equipment.

[4]As noted above, when defense counsel previously moved for mistrial, he advised the Court that it was difficult to fashion a curative instruction and could not suggest language that would suffice. (Tr., 8/4/05, at 85:20-22).

In the course of his rebuttal testimony (sic), Mr. Moore indicated and said something along the lines of that perhaps there was some additional evidence he might have been able to bring or that the Court would have allowed for your consideration.

*It is not something that you should take into account at all, and I'm asking you at this time to disregard those comments completely.*

(Tr., 8/4/05, at 90:15-23).[5]

Finally, counsel for Lincoln Park confirmed that the renewed motion for mistrial was made on behalf of all defendants, and this was acknowledged by the Court. (Tr., 8/4/05, at 133:2-7).

The government may argue that the comment was taken out of context or otherwise was not prejudicial. That is incorrect. Defendants submit the following: First, the government made it a point of its rebuttal to tell the jury that the government had brought them "the evidence as we have it." (Tr., 8/4/05, at 73:14; 83:19-20). Moreover, the offending statement was made not once, but twice. The second time the prosecutor said "We have brought you the evidence as we have it, the evidence ***as the Court has allowed it***, . . ." (emphasis supplied) (Tr., 8/4/05, at 83:19-21), suggesting [once again[6]] that there was other evidence that the Court had not allowed.

---

Defendants continue to submit that despite the fact that the Court gave a curative instruction, no such instruction would be curative under the circumstances presented here.

[5]In connection with the issue raised in footnote 3, above, the Defendants note that following the completion of the Court's general instructions to the jury, counsel again approached in order to make their objections to the charge, and specifically to object to the failure of the curative instruction to address adequately the prosecutor's offending remarks. Counsel for Mr. Potter told the Court, in connection with the curative instruction, "We still have a problem with it, so we'll renew the mistrial motion. You did not—" (Tr., 8/4/05, at 129:5-7). The Court briefly interrupted to deny the mistrial motion (id., at 129:8-9), and counsel continued "You didn't reference the most troubling part of it, which was a reference to evidence that—***the Government could rely on evidence the Court did not let in***." (Emphasis supplied) (Id., at 129:11-14). The Court responded "I did. . . . I think I did, . . ." (Id., at 129:15, 17). This statement was based on what the parties actually heard in the courtroom and the Court's earlier remark indicating that she also thought the statement referred to evidence she had excluded (Tr., 8/4/05, at 86:6-8), and asking for identification of the precise issue warranting the curative instruction. (Tr., 8/4/05, at 89:25 through 90:1: "I will give a cautionary instruction ***with respect to that line***.") (Emphasis supplied).

[6]See footnotes 3 and 5, above.

Second, when the government's action is placed in the context of the trial, the gravity of the offense is magnified. The Court will recall that there were several items of evidence that the government fought fiercely to have admitted, but which the Court correctly excluded under Rule 403. One of these was Government Exhibit 150 (and its companion Exhibit 151). Another was Government Exhibit 109. Finally, there was Government Exhibit 50, which the Court allowed but subject to a limiting instruction, that it was not admissible for its truth. All of these exhibits either directly (Exhibits 50 and 109) or indirectly (Exhibits 150 and 151) concerned information that the government never introduced into evidence through proper means and that defense counsel argued was fatal to the prosecution during the Rule 29 hearings—i.e., evidence concerning John Harwood and his position, power and influence. Most important for the Court's consideration here, however, is the fact that the battles concerning the introduction of some of this evidence were fought out in the presence of the jury. The government proffered Exhibits 150/151 (or a redacted version known as 150-A) on multiple occasions (in this trial[7]), through or during the testimony of various witnesses.[8] Moreover, the government admitted why it was so desperate to get this evidence before the jury:

---

[7]This was after five unsuccessful attempts to introduce it in the first trial.

[8]The Court will recall that after repeated efforts by the government to admit Exhibits 150 and 151, and despite defense counsel's position that "foundation" requirements were irrelevant to the 403 analysis of this evidence, the Court made it unmistakably clear to the government that if Exhibits 150/151 were ever to be considered for admission, the only witness who could conceivably provide the necessary foundation was Mark Elliott. After suggesting several times that it would call Mr. Elliott, the government never did so. And when the defense put Mr. Elliott on the stand, the government made no effort to introduce evidence that it had previously claimed was critical to its case and properly admissible, despite what must have appeared as an invitation by the Court to do so with this particular witness. One explanation for the government's strategy of attempting to introduce this evidence without Mr. Elliott as its steward may be that an examination of Mr. Elliott's grand jury testimony on this point made it apparent to defense counsel that the government was acting in bad faith. Defendants are aware that the Court has not seen Mr. Elliott's grand jury testimony, and make the following representations as to its contents as officers of the Court. The relevant portions of the testimony are not attached here for the same reason that Exhibits 150 and 151 were not admitted into evidence, since those issues will arise again in the event a new trial is granted, either by this Court or by the Court of Appeals. However, the testimony is available to the Court for its review upon request.

The government stated repeatedly during the trial that it was offering this evidence because it provided an opportunity for the government to argue to the jury that the suggestion contained in Mr. Elliott's question at the June

> ***This is also a very difficult case from the Government's standpoint.*** And as the Court knows, we went through this once, it was a hung jury. I frankly, very candidly and objectively -- the reason why I didn't try to get it in in the first trial in my case-in-chief was, frankly, ***I thought I could prevail without it. * * * and the outcome, of course, was that the jury hung.*** * * * I emphasize that only because ***it is such a close case in terms of both sides having a great deal to argue with and having different theories, each of which has support.*** (Emphasis supplied) (Tr., 7/20/05, at 128:21-25 though 129:1-2; 129:10-11; 129:16-19).

The Court agreed with the importance of the evidence: ". . . I think, as I said, this is a matter of great significance to both sides in this case. It was a matter of great concern to the Court in the first trial, . . ." (Id., at 157:20-23).

Many of the Government's attempts to introduce this Exhibit were made in the presence of the jury. (Tr., 7/19/05, at 113:15 through 114:25; 117:20-21; 124:23 through 125:20; Tr., 7/20/05, at 9:16 through 10:19; Tr. 7/28/05, at 43:12-25 through 44:1-25).

Although some exclusionary rulings were made by the Court at sidebar, it was impossible for the jury not to be aware that these items of proffered, but not admitted, evidence constituted what the Government believed was compelling and significant inculpatory evidence that the jury

---

20 meeting was evidence of nefarious conduct, from which the government wished the jury to draw inferences of guilt, based, significantly, on Mr. Potter's state of mind. Upon each effort to admit the evidence, however, the government was aware that Mr. Elliott's grand jury testimony was exactly the opposite of the inference it wanted the jury to draw from the Exhibit it sought to admit, and that the impression it wanted to create in the minds of the jurors concerning Mr. Potter's state of mind was incorrect and unfair.

Mr. Elliott testified before the grand jury that he asked the question attributed to him at the June 20 meeting for two reasons: one was because he had heard some negative comments from a co-worker in England who had traveled frequently to Rhode Island, and he was taking this meeting as his first opportunity to make sure that "there was a completely clean slate". He also said that he "got categorical assurance" that nothing of the kind his question implied had occurred. He further testified that the answer given to the question by Mr. Bucci as reported in Exhibits 150/151 was not only inaccurate, but that Mr. Bucci was "quite surprised at the question" and that he went on to demonstrate to those present at the meeting (including Mr. Sherman and Mr. Brents) how "clean" Lincoln Park was. He testified that Mr. Bucci's response gave him the assurance that he was seeking. Mr. Elliott would have been required to acknowledge his grand jury testimony concerning Mr. Bucci's reaction and actual response to the question he posed at the meeting. This was testimony with which the government was intimately familiar. It was testimony which the government has had for more than two years and which it had on each occasion it sought to introduce this evidence through witnesses whose cross-examination could not have revealed this information. This shows that Mr. Elliott was not the witness through whom the government would have wanted to admit this evidence in its case-in-chief.

The government was wise enough not to risk what would surely have been a successful defense request for mistrial and dismissal for prosecutorial misconduct and therefore did not inquire of Mr. Elliott.

should have been allowed to consider. Consequently, the rebuttal comments inappropriately suggested to the jury that the government was unable to present or was prevented from presenting to them damaging evidence, or that this Court kept evidence from them despite the fact that the Court had repeatedly acknowledged the prejudicial character and inflammatory nature of this evidence.

Likewise, with respect to Exhibit 50, the Court attempted to limit the improper use of this evidence with a cautionary instruction. (Tr., 7/20/05, at 69:22-70:9).[9] Given the deficiencies in the government's proof concerning Mr. Harwood's position and public duty, it is unlikely that the jury was able to apply the limitation. In fact, the government attempted to invite the jury to improperly consider this limited evidence early in the opening remarks during the main closing argument: "It is as simple as this. They wanted to bribe John Harwood, ***the Ocean State emperor***." (Emphasis supplied) (Tr., 8/3/05, at 5:14-15). Such a reference invited the jury to take the editorial for its truth, something the Court expressly forbade.

There is still more. The defense closings stressed the failure of proof concerning Mr. Harwood, both in regard to his financial relationship to his law partner and even more so, to his official duties and honest services to the State of Rhode Island. The government's statement in rebuttal invited the jury to ignore the Court's instructions – particularly instructions 33 and 34, which the government, like defense counsel, knew the Court would be giving a few moments later.

While the government likely realized during the Rule 29 arguments on August 2 that it had not offered the evidence necessary to prove the allegations in the indictment, when that

---

[9]During the exchange at the bench concerning the introduction of this Exhibit, defense counsel objected based upon its highly inflammatory and prejudicial contents. Moreover, defense counsel specifically advised the Court that no limiting instruction would be sufficient to cure the prejudice inherent in the newspaper article. Their request for a redaction of the most inflammatory portions of the article was denied, as were their several motions for mistrial. (Tr., 7/20/05, at 67:24-69:16).

failure was highlighted and laid at the government's doorstep during final arguments on August 4, it is clear from the rebuttal that the government feared that the jury would also see that failure and, if so, the case was all but lost. The government then made a decision to salvage the case by acknowledging the failure to produce evidence, suggest that there was additional evidence available that it might have offered, and invite the jury to "blame" the prosecutor, who "did his best" and despite the lack of evidence, convict the Defendants on the basis of the missing evidence, sympathy for the government, or both.

## II. The Law

The Defendants recognize that "Rule 33 provides that a motion for a new trial may be granted if the court finds that 'the interests of justice so require'" and that "[t]he remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result. *United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir.1986)." United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001). Here, the government's rebuttal argument warrants a new trial.

### A. The Standard of Review

The government's conduct was improper, as recognized by the Court. This Court must now decide whether to grant the Defendants' Motion For New Trial because of that improper conduct.[10]

[10] The prosecutor's actions, taken in sum, were also in violation of the ABA Standards For Criminal Justice, The Prosecution Function, particularly Standard 3-5.8:

> (a) The prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.
> (b) The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
> (c) The prosecutor should not make arguments calculated to appeal to the prejudices of the jury.
> (d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.

ABA Standards For Criminal Justice, 3rd Edition, Thompson/West, 1993.

The First Circuit has held that:

> Closing arguments are reviewed *de novo* and reversible error will be found only if the arguments were " 'both inappropriate and harmful.' " *United States v. Laboy-Delgado,* 84 F.3d 22, 29 (1st Cir.1996) (citation omitted). Prosecutorial comments will be found harmful if, "in the totality of the circumstances, they would probably have affected the outcome of the trial." *Id.* [FN19]
>
> > FN19. Among the relevant factors to be considered are "the severity of the purported misconduct, the weight of the evidence supporting the verdict, the presence and likely effect of a curative instruction, and the prosecutor's purpose in making the statement (i.e.: whether the statement was willful or inadvertent)." *Laboy-Delgado,* 84 F.3d at 29.

United States v. Balsam, 203 F.3d 72, 87 (1st Cir. 2000).

B. The Offending Conduct: Reference to Missing or Non-Admitted Evidence

In Greenberg v. United States, 280 F.2d 472, 475 (1st Cir. 1960), the First Circuit ordered a new trial based upon prejudicial conduct by the United States Attorney and proof of the government's case through hearsay evidence. With respect to the former, in discussing the impropriety by the government in expressing personal belief in testimony, the Court highlighted the prejudicial error in referencing evidence that was not introduced during the trial:

> To permit counsel to express his personal belief in the testimony (*even if not phrased so as to suggest knowledge of additional evidence not known to the jury*) would afford him a privilege not even accorded to witnesses under oath and subject to cross-examination. Worse, it creates the false issue of the reliability and credibility of counsel. This is peculiarly unfortunate if one of them has the advantage of official backing. (emphasis supplied).

---

The Commentary to this Standard is particularly apposite here:

> The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. ***Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office***. (Emphasis supplied)

The Court confirmed that the prosecution's suggestion of knowledge of additional evidence not known to the jury was inappropriate notwithstanding a caution expressed, after defense counsel objected to the prosecutor's statement.

Here, among other inappropriate comments, the prosecutor not only announced his personal belief in the Defendants' guilt[11], but also expressly invited the jury to consider evidence not presented during the trial to support a guilty verdict: "***Maybe there could have been something that I could have given you, brought in here. Maybe I could have brought something in that the Court would have allowed in that didn't come in***." (Emphasis supplied) (Tr., 8/4/05 at 73:7-13).

As the Sixth Circuit Court of Appeals noted in Washington v. Hofbauer, 228 F.3d 689, 700 (6th Cir. 2000):

> Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Donnelly v. DeChristoforo,* 416 U.S. 637, 646, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). For similar reasons, asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way. *See Berger v. United States,* 295 U.S. 78, 84, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). This is particularly true when a prosecutor misrepresents evidence because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty. *See id.* at 88, 55 S.Ct. 629.

Other courts are in agreement. "We have held many times before, and we hold once again, that in closing argument counsel may not refer to, or rely upon, evidence unless the trial court has admitted it. (Citations omitted)." United States v. Maddox, 156 F.3d 1280, 1282 (D.C.Cir. 1998) (reversed and remanded for new trial on this ground).

[11]See footnote 13, *infra*.

This is not a novel concept. It was identified years ago by the Supreme Court. As the Eleventh Circuit Court of Appeals observed in United States v. Eyster, 948 F.2d 1196, 1207 (11th Cir. 1991):

> Implying the existence of additional evidence not formally before the jury severely impairs the likelihood of a fair trial. In *Berger v. United States,* 295 U.S. 78, 88-89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the Supreme Court reversed a conviction when the prosecutor through questioning and argument implied personal knowledge of additional evidence. The Court noted the government's unique burden of justice and heightened responsibility in court:
>
> > The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all . . . .
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations *and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.*
>
> *Id.* (emphasis added); *see also United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (vouching may jeopardize the defendant's right to be tried solely on the evidence presented to the jury).

Here, the prosecutor asked the jury to "blame him" for the failure to produce evidence. He said, "I'm not perfect. Maybe it could have been done better." (Tr., 8/4/05, at 73:8-9). Such remarks are clearly improper. See, e.g., United States v. Josleyn, 99 F.3d 1182, 1197 (1st Cir. 1996). Moreover, this statement improperly lessened the government's burden of proof by inviting the jury to blame the prosecutor personally for a deficiency in the government's proof. The government also invited the jury to consider evidence outside the record that would support a verdict of guilty. Such conduct is inappropriate, violates the Defendants' right to a fair determination of the issue of guilt or innocence, and cannot be effectively cured by an instruction

from the Court. "An error may be so prejudicial that no cautionary instruction can safely eradicate its effect." United States v. Smith, 500 F.2d 293, 297 (6th Cir. 1974).

Comments on "missing" evidence are grounds for reversal in certain circumstances, including situations in which the referenced evidence does not exist at all. See, e.g., United States v. Beckman, 222 F.3d 512, 526-527 (8th Cir. 2000); see also, United States v. Murrah, 888 F.2d 24, 27 (5th Cir. 1989).

It is well recognized that offending conduct similar to that at issue here takes on much greater significance in the context of a close case. See, e.g., United States v. Washington, 263 F.Supp.2d 413, 425, 431 (D.Conn. 2003) (Arterton, J., granting Defendant's motion for new trial). Consequently,

> because the "societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence," *U.S. v. Mechanik,* 475 U.S. 66, 73, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), Washington's conviction is vacated, his amended motion for new trial [Doc. # 68] is GRANTED, and a new trial is ordered.
>
> Id., at 440.

Compare, United States v. Kornegay, 410 F.3d 89, 97 (1st Cir. 2005) (government's inappropriate statements not prejudicial based on limited nature of infraction, detailed and explicit curative instruction and strong evidence of guilt).

C. Application of The Standard.

The application of the standard of review requires this Court to look at the severity and willfulness of the offending conduct and the presence and effect of curative instructions, all in the context of the case as a whole in light of the weight of the evidence.

Another trial court undertook review required under Rule 33, and its analysis of issues strikingly similar to those presented here is instructive. In United States v. Schneider, 157 F.Supp.2d 1044 (N.D.Iowa 2001), the Court first reviewed a defendant's Rule 29(c) motion and found the evidence sufficient to sustain the conviction. Id., at 1054. It then went on to consider Schneider's motion for new trial and noted at the outset that

> Federal Rule of Criminal Procedure 33 provides in relevant part as follows: "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." FED.R.CRIM.P. 33. District courts have broad discretion in passing upon motions for new trial and such rulings are subject to reversal only for a clear abuse of discretion. *See United States v. Wilkins,* 139 F.3d 603, 604 (8th Cir.1998); *United States v. Brown,* 108 F.3d 863, 866 (8th Cir.1997); *United States v. Blumeyer,* 62 F.3d 1013, 1015 (8th Cir.1995), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 212 (1996).
>
> A court evaluates a Rule 33 motion from a different vantage point than it evaluates a Rule 29 motion for judgment of acquittal. *U.S. v. Ortiz,* 40 F.Supp.2d at 1082. Indeed, "[a] district court's power to order a new trial is greater than its power to grant a motion for acquittal." *United States v. Ruiz,* 105 F.3d 1492, 1501 (1st Cir.1997); *accord United States v. Bennett,* 956 F.2d 1476, 1481 (8th Cir.1992) ("This narrowly constricted power of review [applicable to motions for judgment of acquittal] is in contrast to the district court's broad discretion in ruling upon a motion for new trial."); *United States v. A. Lanoy Alston, D.M.D., P.C.,* 974 F.2d 1206, 1211 (9th Cir.1992) ("A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal.").

Id., at 1054-1055.

In Schneider, the basis for the new trial motion was prosecutorial misconduct, and the Court began by setting forth the Eight Circuit standard of review for such requests—a standard containing the same requirements as those considered in the First Circuit:

> When alleged prosecutorial misconduct is the basis for a defendant's new trial motion, the Eighth Circuit Court of Appeals has clearly set forth a two-part test for reversible prosecutorial misconduct: "[F]irst, the prosecutor's conduct or remarks must have been improper, and second, the remarks or conduct must have prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial." *United States v. White,* 241 F.3d 1015, 1023 (8th Cir.2001) (citing *United States v. Beeks,* 224 F.3d 741, 745 (8th Cir.2000)). "Inappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to

> reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, ... the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *United States v. Franklin,* 250 F.3d 653, 660-61 (8th Cir. May 22, 2001) (citing *United States v. Nelson,* 988 F.2d 798, 807 (8th Cir.1993)). In assessing the prejudicial impact of prosecutorial misconduct, a reviewing court should consider: (1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence; and (3) the curative actions taken by the district court. *United States v. Wadlington,* 233 F.3d 1067, 1077 (8th Cir.2000); *United States v. Beckman,* 222 F.3d 512, 526 (8th Cir.2000) (same); *United States v. Beeks,* 224 F.3d 741, 745 (8th Cir.2000) (same). "However, a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *United States v. Johnson,* 968 F.2d 768, 771 (8th Cir.1992) (internal quotations omitted). The key question ultimately is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *see also United States v. Young,* 470 U.S. 1, 11-12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (explaining that criminal conviction was not readily overturned on basis of prosecutor's comments alone; statements must be viewed in context of entire proceeding in order to determine whether conduct affected fairness of trial); *Beckman,* 222 F.3d at 526.

Id., at 1055-1056.

As in the present case, the most serious allegation of misconduct in Schneider was a remark made during the prosecutor's rebuttal argument. Id., at 1056. In Schneider, defense counsel, in his closing argument, had repeatedly attacked the government for failing to conduct polygraph examinations of its witnesses, even though to do so was an option for the government under the witness' plea agreements. In reply, the government claimed that it was thereby invited to respond accordingly, relying on the doctrine of "fair response" as outlined in the Eight Circuit in United States v. Flynn, 196 F.3d 927 (8th Cir. 1999). Id., at 1060. The prosecutor's allegedly "invited" response in Schneider was to ask the jury to consider the fact that Schneider himself and the other defense witnesses, who, like the government's witnesses, testified at the trial, also did not take polygraph tests. After dispensing with the claim that the prosecutor's argument was "fair response" (id., at 1060-1062), the Court noted that it was troubled by the fact that the

prosecutor was aware that the defendant had offered to submit to a polygraph examination both before and during the trial, but the government declined the offer, leaving the court "with the impression that the prosecutor's closing rebuttal argument contained improper insinuations and assertions designed to mislead the jury or allude to facts not in evidence." Id., at 1062, citing Berger v. United States, supra.

In granting the motion for new trial, the court considered the cumulative effect of the misconduct, even while finding that the single statement in the rebuttal argument alone warranted the relief requested:

> In this case, because the prosecutor's statement during the rebuttal closing argument was so egregious, suggestive, and inflammatory, the court concludes that it, alone, infected the entire trial. *See United States v. Beeks,* 224 F.3d 741, 746 (8th Cir.2000) (stating that "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated") (quoting *United States v. Johnson,* 968 F.2d 768, 771 (8th Cir.1992)); *United States v. Carter,* 236 F.3d 777, 788-89 (6th Cir.2001) (stating that "even a single misstep on the part of the prosecutor may be so destructive of the right of the defendant to a fair trial that reversal must follow") (internal quotation and citation omitted). It must be remembered that the prosecutor's statement was the last words the jury heard from an attorney before deliberations. Consequently, in light of the prejudicial content of the statement, the time at which it was said to the jury, as well as the fact that is was an Assistant United States Attorney who made the statement, *see United States v. Solivan,* 937 F.2d 1146, 1150 (6th Cir.1991) (explaining that jurors are likely to "place great confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions [by the prosecutor] are apt to carry weight against a defendant"); *Young,* 470 U.S. at 18-19, 105 S.Ct. 1038 (the danger in such comments is that "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence"); *Berger,* 295 U.S. at 88, 55 S.Ct. 629 (explaining that a prosecutor's "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none"), the court concludes that this statement, alone, weighs in favor of a new trial. *See United States v. Donato,* 99 F.3d 426, 432 (D.C.Cir.1996) (prosecutor's remarks in summation calling defendant a liar were reversible error where case turned on defendant's credibility).

In considering the effect of the prosecutor's conduct throughout the trial, the Court noted that the rebuttal comment was not "'an aberration in an otherwise fair trial.'" comparing United States v. Evangelista, 122 F.3d 112, 120 (2d Cir.1997) (id., 1064), and citing United States v. Young, 470 U.S. 1, 11 "(stating that the determination of whether a prosecutor's behavior constituted prejudicial error must be made in the context of the whole trial)." (Id., at 1066).

The Court in Schneider also, as it must, considered the weight of the evidence otherwise properly admitted at trial, and found that "while there was sufficient evidence presented at trial to support the jury's guilty verdict, this evidence was not so strong as to overcome the improper comment made by the prosecutor, especially in light of the other instances of imprudent conduct by the prosecutor." (Id., 1066). The Court also considered, in making the evaluation of the remaining evidence, that the prosecution's case was met "with a strong and zealous defense" and "defense counsel's forceful closing argument." (Id., at 1067).

Finally, the Court in Schneider also considered the effect of its own curative instruction. While the Court acknowledged that it gave the instruction on the Monday following the Saturday rebuttal argument, it is clear that the instruction given in Schneider was significantly stronger than the one given here. In Schneider, the trial judge told the jury that the prosecutor's statement was "highly improper and legally wrong" and explained the burden-shifting rationale for its determination; he then told the jury that defense counsel's final argument which the prosecutor alleged "invited" his response was, in fact proper, and explained why. Finally, the court said that "[b]ecause [the prosecutor's] remark was highly improper, you are instructed to completely disregard it." (Id., 1067).

In reconsidering his own instruction, given sua sponte, the trial judge said "although the court recognizes that curative instructions are looked upon favorably by the appellate courts in

curing prosecutorial misconduct that occurs during trial, . . . and that jurors are presumed to follow the court's instructions, . . . the court has grave reservations, given the circumstances in this case, that the curative instruction dispelled the undue prejudice that stemmed from the prosecutor's improper remark, particularly because the prosecutor's comment clearly misled the jury." (citations and case quotations omitted). Id., at 1067-1068.

In finding that despite the fact that "viewing the evidence in the light most favorable to the government, a reasonable jury could have found [the defendant guilty]", the court concluded that even considering the presence of the court's own strong curative instruction, the prosecutor's conduct made "the resulting conviction a denial of due process" (id., 1070-1071), the trial judge thought it noteworthy to admonish the parties:

As Judge Jerome Frank explained:

> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the [prosecutor] here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, 'Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of "disapproved" remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial.' Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court--recalling the bitter tear shed by the Walrus as he ate the oysters--breeds a deplorably cynical attitude towards the judiciary.

*United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 661 (2d. Cir. 1946) (Frank J., dissenting), *cert. denied,* 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640, (1946) (footnote omitted). As explained in the foregoing, the court concludes that

the prosecutorial misconduct that permeated this trial demands more than the "ritualistic verbal spanking."

Here, the willfulness of the offending conduct is established by the prosecutor himself. He told the Court in the bench conference following the objection to the "excluded evidence" statement that he made his remarks deliberately, but that he felt it was fair response to defense counsel's comments on the lack of evidence. (Tr., 8/4/05, at 88:2-12). The severity of the offending conduct is established by the Court. The Court said she was concerned about "inviting [the jury] to think about what else might be out there" (Tr., 8/4/05, at 88:13-14) and, having determined that the prosecutor's comments warranted a curative instruction (regardless of its effectiveness), thereby established the severity of the remark. Counsel suggested to the Court at the time that it would be extremely difficult to fashion an effective curative instruction.[12]

The effectiveness of curative instructions should be viewed through the lens of cases like Dunn v. United States, 307 F.2d 883, 886 (5th Cir. 1962):

> In every case involving improper argument of counsel, we are confronted with relativity and the degree to which such conduct may have affected the substantial rights of the defendant. It is better to follow the rules than to try to undo what has been done. Otherwise stated, one 'cannot unring a bell'; 'after the thrust of the saber it is difficult to say forget the wound'; and finally, 'if you throw a skunk into the jury box, you can't instruct the jury not to smell it'.

Review in these circumstances is never easy. As the Sixth Circuit observed in United States v. Smith, supra, 500 F.2d at 296-297:

> We adhere to the rule stated by Judge Simon for this circuit in *Pierce v. United States*, 86 F.2d 949 (6th Cir. 1936), for testing prejudice where a

---

[12]As it relates to the issue raised in footnotes 3 and 5 above, the instruction the Court gave (Tr., 8/4/05, at 90:15-23), despite the comment that it would be directed to a particular segment of the prosecutor's remark (Tr., 8/4/05, at 89:21-25 through 90:1), did not touch at all on that portion of his statement and counsel so advised the Court (Tr., 8/4/05, at 129:10-13).

cautionary instruction has been given a jury because of a prosecutor's improper argument:

> The inquiry . . . must always be whether in the view of the whole record the impression conveyed to the minds of the jurors by irrelevant and prejudicial matter is such that the court may fairly say that it has not been successfully eradicated by the rulings of the trial judge, his admonition to counsel, and his instruction to the jurors to disregard it.
> *Pierce*, *supra* at 952. *See also Ippolito v. United States*, 108 F.2d 668 (6th Cir. 1940).

The inquiry is necessarily a speculative one, but we are not without guidance. The Supreme Court, in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945), has set forth the standard to apply in determining whether harmless error has resulted from improper evidence or from improper argument to the jury:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. *Bruno v. United States*, 308 U.S. 287 at page 294, 60 S.Ct. at page 200. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos, supra* 328 U.S. at 764-765, 66 S.Ct. at 1248.

The Rule 29 motions and arguments address the weight of the evidence issue and will not be restated here. Suffice it to say, however, that the "missing evidence" remark went to the core of the defense arguments that there was in fact no evidence to support the allegations of the indictment in the context of what the Court would instruct the jury it was required to find. The damage to the defense is underscored by the improper reference to the newspaper editorial (Exhibit 50), coupled with the invitation to speculate on other evidence that may have been

available and did not come in. This occurred against the backdrop of the battle waged before the jury concerning the minutes of the June 20 Board meeting (Exhibits 150/151), which were not admitted. The unfair prejudice to the Defendants is heightened by the lack of evidence in the case concerning John Harwood or from which the jury could determine the standard against which to judge any alleged deviation from his delivery of honest services to the public.

The government suggested to the jury (despite a lack of evidence) that John Harwood could do all the things alleged in the indictment, and it is for these reasons that the Defendants wanted to bribe him. Moreover, the jury need not worry about a lack of evidence. If there is a concern, blame me, but don't acquit. All you need to look at in this case are the faxes, which I, as the representative of the Government of the United States of America, guarantee are sufficient evidence of guilt.[13]

The government's suggestion that there was other evidence of guilt that the government did not or could not introduce into evidence, was entirely improper. There was no evidence that John Harwood could do any of the things he was alleged in the indictment to be capable of doing, i.e., to control or influence the composition and activities of the Lottery Commission, and to determine the outcome of Indian casino legislation.[14] That government's failure to produce

---

[13]Later in the same rebuttal argument, the prosecutor said ". . . if you read the faxes, the communications between those two men, start to finish, every word, ***I guarantee it screams that these Defendants are guilty***, and I ask you to find them guilty." (Tr., 8/4/05, at 84:1-4) (Emphasis supplied).

In considering the entire trial, as Rule 33 requires in this analysis, the Court may consider the matters raised below in Part Two of this motion. While reliance on any or all of these items is unnecessary to granting the relief requested, as the arguments in Part One are sufficient in and of themselves, consideration of the entire record provides the Court with added texture in the significant aspect of evaluating the intent of the government and distinguishing the remark complained of here from the inadvertent or "heat of battle" comment. Other items that the Court may consider in this regard are incidents that were objected to at trial, such as the government's attempt, rebuffed by the court, to impeach Mark Elliott with his immunity agreement (Tr., 8/1/05, at 10:25 through 16:5). See also, footnote 8, supra.

[14]The government has taken the position that it was not required to prove whether Mr. Harwood could have done any of these things. This argument is specious for two reasons. The first is set forth in the Defendants' Rule 29 motions concerning the standard by which any deviation is judged. The second is that the government put these

sufficient evidence is not a matter of blame, but of reasonable doubt. The only properly admitted evidence in the entire case on this subject was the stipulation that Mr. Harwood did not vote on any legislation that affected Lincoln Park (which reasonably included the Indian casino legislation).

The government conceded this was a close case when it attempted to move Exhibit 150 into evidence early in the trial, and the Court acknowledged that there were additional reasons that the first jury was hung:

> MR. MOORE: This is also a very difficult case from the Government's standpoint. And as the Court knows, we went through this once, it was a hung jury.
>
> THE COURT: I don't necessarily agree, though, that the reason why the jury hung was solely related to this one particular item or events.
>
> MR. MOORE: I understand, Judge. I do understand that. I emphasize that only because ***it is such a close case in terms of both sides having a great deal to argue with and having different theories, each of which has support***.
>
> (Tr., 7/20/04, at 128:21-23; 129:12-19) (Emphasis supplied).

The closeness of this case, as conceded by the government, underscores how prejudicial the offending conduct was in the context of the case, thereby requiring a new trial. The Supreme Court made this clear in Berger, supra, 295 U.S. 78 at 89: "[i]n these circumstances, prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached." See, e.g., United States v. Catton, 89 F.3d 387, 392 (7th Cir. 1996) (reversing conviction based on prosecutor's misstatements: ". . . there was enough evidence to convict [the defendant]. But the evidence

---

allegations in the Indictment, specifically in paragraphs 6, 13, and 31, and argued to the jury that the *only* reason the Defendants wanted to bribe Mr. Harwood was *because he could do these very things*.

was not so one-sided that the false closing argument and false expert testimony can be disregarded. These errors may well have spelled the difference between conviction and acquittal.").[15]

When the government's actions are viewed in their totality, it is clear that they were deliberately taken in an effort to salvage what the government itself concedes was a close case, and there can be no doubt that the prejudice to the Defendants is significant and clear. The conduct, in this case, makes an observation of the Fifth Circuit apropos:

> We understand the temptation for the prosecutor; it is difficult to lay aside so potent a weapon. But we do not say this to forgive the error. To the contrary. That the prosecutor succumbed is a testament to the force of the poison he reached for. He thought it was effective and needed to make his case, or he would not have made the argument. Such lack of discipline wins battles and loses wars. It is a losing argument.

United States v. Kang, 934 F.2d 621, 627 (5th Cir. 1991) (reversing conviction).

At trial, the prosecutor asked the jury to blame him for any shortcomings in the government's case, but to convict the Defendants anyway. The Court, however, cannot condone this conduct. The Court must protect the Defendants' rights to a fair trial. The Defendants do not seek to blame the prosecutor, but to hold the government to proper conduct. The motion for new trial must be granted.

---

[15]Reversal may be warranted even in the face of overwhelming evidence:

> The unfair, unwarranted and reprehensible summation deprived the defendant of the fair trial which is his right, regardless of how clear his guilt may seem or how strong the proof against him. Arguments such as those made in the prosecutor's summation should be beneath the dignity of a representative of the government of the United States as they are incompatible with the proper administration of criminal justice. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

United States v. Bugros, 304 F.2d 177, 179 (2d Cir. 1962).

## PART TWO

## Further Considerations.

The errors cited above did not occur in an otherwise unobjectionable argument. To the contrary, they occurred in the context of multiple misrepresentations of fact and statements of personal opinion. This context augments the prejudicial impact of the errors cited above and sheds light on the prosecutor's intentions. Under the interests of justice standard applicable on a new trial motion, this Court can and should look at the prosecutor's closing as a whole in assessing the need for appropriate relief.[16]

The government's attempts to remedy the flaws in its case included multiple misstatements and mischaracterizations of the trial evidence (Tr., 8/3/05, at 55:6-56:8; 57:24-58:2; 58:7-19; 8/4/05, at 75:10-16; 83:1-6), as well as improper expressions of personal opinion (in addition to the offending comments about blaming him for the government's failure to introduce essential evidence) (e.g., Tr., 8/4/05, at 84:1-4 [". . . if you read the faxes, the communications between those two men, start to finish, every word, ***I guarantee it screams that these Defendants are guilty***, and I ask you to find them guilty."]). See also, Tr., 8/3/05, at 24:1-7; 26:18-22; 51:19-21; and Tr., 8/4/05, at 82:3-6.

This is particularly troublesome because the prosecutor is a representative of the government, the sovereignty. He suggested to the jury there was evidence that it did not have a chance to consider and he was giving his personal "guarantee" to the guilt of the Defendants.

[16]The Defendants acknowledge at the outset that some of these are matters to which no contemporaneous objections were made, but which may be taken into account by the Court as part of its Rule 33 new trial analysis. They are also raised here because failure to do so may result in a waiver of appellate review of these issues. These are not matters upon which the Court must rule favorably to the Defendants in order to grant the Motion For New Trial as set forth in Part One of the Motion. In fact, Part One of the Motion stands alone and warrants the relief requested.

The case law is legion that prosecutorial statements of personal belief are improper, and the reasons for proscribing it themselves prove the severity. Similarly, misstatements and mischaracterizations of trial evidence are always severe if they go to the heart of the defense, as they did in this case.

## I. <u>Misstatements and Mischaracterizations of Trial Evidence</u>.

The government proffered a series of assertions which inaccurately recounted key evidence, ultimately sparking a defense objection which this Court overruled. (Tr., 8/4/05, at 83:6-11). Most importantly, the government argued that Mr. Potter hid the critical information when in fact he divulged it:

> "Mr. Potter didn't tell everybody everything. And the two things he kept quiet from everybody, ***from everybody***, the total amount, it could amount to millions of dollars, four to be exact, 2.4 million if you look at the four years that the $600,000 was included in the budget for, and he didn't tell everybody that was linked to the machines."
>
> (Tr., 8/4/05, at 75:10-16) (emphasis supplied).

This was a focal point of the government's case: Mr. Potter may have told his Board and others about the bonus concept, but he concealed the information which really mattered: the terms of the payments and their linkage to obtaining VLT machines.

The problem is that, even according to the government's own evidence, this assertion was untrue. Mr. Sherman testified that, during the January 24, 2001 meeting, he asked and was told about the details of the McKinnon payment.

> "A. Yes. I asked him [Nigel Potter] for the details of what the amendment was for, and he explained to me what the details of the agreement with McKinnon were."
>
> (Tr., 7/20/05, at 75:16-19).

Mr. Brents augmented this testimony by reading into the record his handwritten notes of the meeting, which specified both the dollar amounts and the linkage to VLT machines:

> "Q. And could you read what you wrote in the bracket after this.
>
> A. Yes. 'This will be a retainer paid monthly, paid monthly for two years, increases to one million per year for three years if permission is granted, will get monthly invoice, will have this sent in.'
>
> Q. When you wrote 'if permission is granted,' what do you mean by that?
>
> A. It refers to if permission is granted for additional machines."
>
> (Tr., 7/25/05, at 38:16-25).

The notes themselves were introduced into evidence as Government Exhibit 51(b). In addition, two Board members testified they were aware that Mr. Potter and Mr. Bucci were having discussions over the proposed McKinnon bonus. In particular, Mr. Harris testified in response to a government question that he was aware that the proposed payment was linked to additional machines:

> "Q. Did Mr. Potter, Mr. Elliott or anyone else working at Wembley plc tell you and the other Board members in either the December budget meeting or the January budget meeting that this proposed payment, the $600,000 to Dan McKinnon, was for – was linked in any way to the achievement of additional machines at Lincoln Park?
>
> A. The requirement for additional legal services and advisory services was clearly linked to the fact that we were proposing to seek approval for about one thousand or fifteen hundred VLT machines because that was a major part of corporate strategy."
>
> (Tr., 8/2/05, at 138:4-14).

In addition to its general assertion that Mr. Potter told no one about the linkage between a proposed payment to Mr. McKinnon and additional machines, the government specifically argued on no fewer than three occasions that Nicholas Casiello was never told that information.

(Tr., 8/3/05, at 57:24-58:2; 58:7-19; Tr., 8/4/05, at 83:1-6). This, too, was wrong and was objected to. (Tr., 8/4/05, at 83:1-9). Mr. Casiello testified that Mr. Potter told him "that Lincoln Park wanted to get the approvals necessary to increase the number of gaming machines at Lincoln Park." (Tr., 8/2/05, at 11:13-15; see also, 17:11-13).[17]

Mischaracterizations and misstatements of the evidence may be so major and so prejudicial as to have caused a miscarriage of justice, requiring even plain error reversal, as occurred in United States v. Santana-Camacho, supra, 833 F.2d 371 (1st Cir. 1987). Using a standard essentially the same as that used by the First Circuit, the Third Circuit noted in United States v. Watson, 171 F.3d 695, 700 (D.C. Cir. 1999):

> A misstatement of evidence is error when it amounts to a statement of fact to the jury not supported by proper evidence introduced during trial, regardless of whether counsel's remarks were deliberate or made in good faith. *See Gartmon,* 146 F.3d at 1025; *United States v. Donato,* 99 F.3d 426, 432-33 (D.C.Cir.1996); *United States v. Small,* 74 F.3d 1276, 1280-81 (D.C.Cir.1996); *United States v. Perholtz,* 842 F.2d 343, 360-61 (D.C.Cir.1988); *Gaither v. United States,* 413 F.2d 1061, 1079-80 (D.C.Cir.1969). The misstatement constituting error is demonstrated here by comparing the witness' testimony with the statements made by the prosecutor in closing arguments. *See Gartmon,* 146 F.3d at 1025; *Perholtz,* 842 F.2d at 360; *Gaither,* 413 F.2d at 1078. The government does not dispute that the prosecutor purported to quote Thomas's testimony. Yet the quote was inaccurate; the error is apparent on the face of the record.

---

[17]These inaccurate assertions were augmented by a further argument that Mr. Potter and Mark Elliott tried to obfuscate the status of the proposal at the January 24, 2001 meeting. In a curious twist, the government claimed that Mr. Potter falsified the minutes of the January 24, 2001 meeting by inserting the words "in principle" – "Nigel noted that Wembley plc had approved *in principle* payments to Dan McKinnon of $500,000 annually for two years and $1,000,000 for three years" – and by adding a sentence that "legal confirmation that this is acceptable is awaited."

The government argued that Mr. Potter's explanation for these amendments was contradicted by his own testimony that none of this was ever said to Sherman and Brents. (Tr., 8/3/05, at 55:6-56:8). But Mr. Potter said nothing of the sort. To the contrary, he told the jury that he "reiterated the outline of the terms which I had agreed was the basis for the budget at the meeting with Dan on the 28th – sorry, 29th and 30th of November." (Tr., 7/27/05, at 102:3-5). Further, the government successfully precluded the defense from putting into evidence documents which established exactly what Mr. Potter meant when he used the phrase "approved in principle," arguing that they were irrelevant. (Tr., 8/1/05, at 4:19-6:13, excluding Potter Exhibits J and I). The government then turned around and argued to the jury that Mr. Potter's editing of the minutes was inconsistent with the explanation he gave the jury. (Id. at 56:9-24). It is inappropriate and improper for the government to object to evidence on relevancy grounds and then make the subject of that evidence a significant piece of its closing argument.

> That Watson is entitled to a new trial by reason of the error is demonstrated by application of this circuit's test designed to determine whether a defendant has suffered sufficient prejudice to warrant a new trial. *See Gartmon,* 146 F.3d at 1026. The test consists of three factors: "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." We have also framed the test for prejudice in terms of the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks. *Gartmon,* 146 F.3d at 1026 (quoting *United States v. North,* 910 F.2d 843, 895, *superseded in part on other grounds,* 920 F.2d 940 (D.C.Cir.1990)). This test applies regardless of whether our review is for harmless error or plain error. [FN3] *Id.* The court determines how the prosecutor's misstatements prejudiced Watson in light of the evidence presented, asking not whether evidence was sufficient to convict notwithstanding the error, but rather whether the court can say that the error did not affect the jury's verdict; if in "grave doubt," the court cannot affirm Watson's conviction. *Kotteakos v. United States,* 328 U.S. 750, 764- 65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), *cited in Lane v. United States,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *United States v. Smart,* 98 F.3d 1379, 1391-92 (D.C.Cir.1996).
>
> > FN3. *Compare United States v. Richardson,* 161 F.3d 728, 737 (D.C.Cir.1998) (plain error review) *with Donato,* 99 F.3d at 432-33 (harmless error review). Because Watson sought, by a motion *in limine,* to prevent the prosecutor from arguing to the jury that Jackson was Watson's girlfriend and his motion was denied, any contemporaneous objection during closing argument would have been superfluous. *See United States v. Mendiola,* 42 F.3d 259, 260 n. 2 (5th Cir.1994); *United States v. Wilson,* 26 F.3d 142, 158-60 (D.C.Cir.1994); *United States v. Mejia-Alarcon,* 995 F.2d 982, 985-88 (10th Cir.1993).

See also, e.g., United States v. Blueford, 312 F.3d 962, 968-969 (9th Cir. 2002) (discussing what is and is not appropriate prosecutorial argument and reversing convictions); United States v. Carter, 236 F.3d 777, 786 (6th Cir. 2001) (reversing conviction and ordering new trial) ("[m]ore importantly, the prosecutor's misrepresentation in this case held an even greater potential for misleading the jury because the misstated evidence, [a witness' testimony], was central to the Government's case.").

Probably the most offensive abuse of evidence here was the government's reference to John Harwood as the "Ocean State Emperor", in clear contravention of the limited purpose for which Exhibit 50 was admitted (Tr., 7/20/05, at 69:22-70:9). It was in a similar situation that the Fifth Circuit Court made its observation in United States v. Kang, supra, at 934 F.2d 621, 627.

## II. Statements of Personal Belief.

The government's arguments are also replete with inappropriate statements of personal opinion and belief. These comments do not stand in isolation from otherwise appropriate closing arguments. The prosecutor projected his belief in the strength of the government's case, predicated not upon the evidence which had been presented in court, but, by necessary implication, on the prosecutor's own experience as a veteran in the war on crime.

> "It is not very often that the government's able to come in and present evidence of an actual written agreement in a conspiracy case." (Tr., 8/3/05, at 26:18-20).
>
> "[I]f that showed up in the front page of the paper, everyone would know what it was." (Tr., 8/3/05, at 51:19-21).
>
> "That's how these things are done, Ladies and Gentlemen, with a wink and a nod and a knowing look, talking in code perhaps, not like super spies, perhaps, because everybody knows what you're talking about." (Tr., 8/4/05, at 82:3-6).

In essence, the prosecutor argued that the jury should trust him – that, as these kind of cases go, this was an overwhelming case. The implication was that he has tried these cases before, and therefore that the jurors should trust him to know a crime when he sees one.[18] But

---

[18]See, e.g., Dunn v. United States, supra, 307 F.2d 883, 885-886 (conviction reversed, new trial ordered on the following basis):

> It is improper for counsel to express his personal opinion or to state facts of his own knowledge, not in evidence, and not part of the evidence to be presented; or to make unwarranted inferences or insinuations calculated to prejudice the defendant. *Taliaferro v. United States*, (9 Cir., 1931) 47 F.2d 699. There can be no doubt that the statement in the closing argument to the effect that all politicians take kickbacks on contracts such as these was prejudicial. At the time Dunn was the elected Mayor of the City of Baxley. The case against Dunn on this point rested on the veracity of

there was no such evidence in the record. There was no evidence about the frequency of written agreements in conspiracy cases or how things are done on a wink and a nod. And a personal guarantee of the quality of the evidence is exactly what the case law prohibits.

Undoubtedly, the most prejudicial was this statement: ". . . if you read the faxes, the communications between those two men, start to finish, every word, ***I guarantee it screams that these Defendants are guilty***, and I ask you to find them guilty." (Tr., 8/4/05, at 84:1-4) (emphasis supplied). Here, the prosecutor personally ***guaranteed*** the Defendants' guilt.

The First Circuit has found this to constitute reversible error noting, in United States v. Gonzalez Vargas, 558 F.2d 631, 633 (1st Cir. 1977)

> The point is that the representative of the government approaches the jury with the inevitable asset of tremendous credibility but that personal credibility is one weapon he must not use.

Likewise, the First Circuit held, in United States v. Cain, 544 F.2d 1113, 1116 (1st Cir. 1973), that "it is, of course, elementary that statements of counsel as to personal belief or opinion are improper." See also, United States v. Cresta, 825 F.2d 538, 555 (1st Cir. 1987) (collecting cases): "There is an abundance of First Circuit case law holding it improper for the prosecutor to inject into his jury argument his personal beliefs about conclusions to be drawn from the evidence." The basis for this concern, as the Court found in Cresta, is two-fold: "1) it implies knowledge of information not before the jury and 2) it places in issue the credibility of counsel, with the government holding a clear advantage. United States v. Rosa, 705 F.2d 1375, 1380 (1st Cir. 1983)." 825 F.2d at 555. As noted in Rosa, 705 F.2d at 1379, this prohibition is "settled law in this Circuit."

---

DeLaigle. To insinuate that Dunn must have gotten the money from DeLaigle because Dunn was a politician and that their relationship was a nefarious political, deal, was improper and prejudicial. The fact that the Court told the jury to 'disabuse your minds of that statement' cannot remove the prejudice.

In United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 282-287 (3d Cir. 1999), the Court discussed another instance of a prosecutor's "guarantee" to a jury, and reversed the convictions, finding that it was not harmless error because the "guarantee" comment went to a critical issue in the case.

In United States v. Damsky, 740 F.2d 134, 138 at n.2, 138-139 and esp. n. 3 (2d Cir. 1984), cert. denied, 105 S.Ct. 298, the Court considered a situation in which a prosecutor "guaranteed" that a witness had actually given certain testimony. There, the Court stated that such a remark was clearly improper, and found the error harmless only because the case did not turn on the testimony to which the remark referred (id., at 139). See also and compare, e.g., People v. Cruz, 1996 WL 875741 (D.Guam 1996), at *3 ("[b]ecause the prosecutor made no reference to extra-record facts and did not offer personal guarantees of . . . truthfulness, his comments were not improper."). See also, United States v. Cantu, 876 F.2d 1134, 1138 (5th Cir. 1989).

In the present case, the Court has an aid in determining the prejudice to the Defendants that is not normally available in most cases—the previous trial. While the faxes were significant items of evidence in both trials, the government made the offending remarks in only the second. The first jury deliberated for nearly six days and could not reach verdicts (other than acquittals) on most counts of the indictment as it then stood. None of the several questions asked of the Court by the first jury related to the faxes.

In his current rebuttal argument, the prosecutor told the jury to blame him for missing evidence, reduce the case to the faxes, and then guaranteed the Defendants' guilt on that basis. The jury deliberated for a much shorter period of time and asked only one question of the Court: "On Counts II through XII, do we only read the fax on its own merits, or do we take into

consideration other evidence we've heard or read?" (Tr., 8/8/05, at 2:5-8). While the Court's response was to repeat the instruction given in the main charge to consider the faxes with all the other evidence, this clearly set up a challenge for the jury between the prosecutor's stamping with the government's imprimatur the most damaging of the trial evidence, and the Court's efforts to instruct the jury to keep the faxes in context. This was a burden the jury should not have had to bear. Compare, e.g., United States v. Levine, 569 F.2d 1175, 1178 (1st Cir. 1978) (where the curative instruction repeated the prosecutor's statement and strongly criticized its use).

In addition to these comments, the prosecutor made an additional specific assertion for which there was absolutely no record support and, hence, could come only from the prosecutor's personal knowledge.

> "I venture to say, Ladies and Gentlemen, that if you could round up all the lawyers in Rhode Island and ask them did you get a million-dollar bonus this year, you wouldn't get any positive responses. It may have been common business practice, it may have been common practice, but it was also illegal."
>
> (Tr., 8/3/05, at 24:1-7).

The government presented no evidence as to "common practices" among attorneys, or the use of success fees to pay lawyers. The record evidence was all to the contrary. As the Court knows, a key component of the defense in this case was Mr. Bucci's concern that Lincoln Park's direct competitor, Newport Jai Alai, had recently paid its law firm a million-dollar bonus for successful political work. This fact was communicated to Mr. Potter, who added it to his pre-existing awareness that Alan Goldman, another attorney, had been paid by Lincoln Park a million dollars for his assistance in obtaining VLTs and simulcast. Notwithstanding this

evidence in the record, the prosecutor in essence told the jury that these justifications were nonsense and that such success fees were illegal.

**Conclusion**

Although the arguments in Part One of the Motion are alone sufficient to warrant a new trial, when taken in conjunction with the cumulative and additional errors described in Part Two, considered in the context of what is "in the interests of justice," the Defendants are entitled to the relief sought and a new trial should be granted.

Dated: August 15, 2005

Respectfully submitted,

DANIEL BUCCI,
By his Attorney,

Anthony M. Traini (#4793)
56 Pine Street - Suite 2
Providence, RI 02903
Tel. 401.621.4700
Fax 401.621.5888

NIGEL POTTER,
By his Attorney,

C. Leonard O'Brien (#1886)
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903
Tel. 401.751.5090
Fax 401.751.5096

LINCOLN PARK, INC.,
By its Attorneys,

John A. Tarantino (#2586)
Patricia K. Rocha (#2793)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel. 401.274.7200
Fax 401.351.4607

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2005, I served a copy of the foregoing pleading by ~~mail~~/hand delivery, upon Craig N. Moore, Esquire, and Lee H. Vilker, Esquire, Assistant United States Attorneys, United States Attorney's Office, The Fleet Center, 50 Kennedy Plaza, Providence, RI 02903.

*342200_1.doc*