**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR No. 03-081ML** |
| | ) | |
| **NIGEL POTTER;** | ) | |
| **DANIEL BUCCI; and** | ) | |
| **BURRILLVILLE RACING ASSOCIATION** | ) | |
| **a/k/a LINCOLN PARK** | ) | |
| **a/k/a LINCOLN GREYHOUND PARK** | ) | |
| **a/k/a LINCOLN PARK, INC.** | ) | |

**OPPOSITION TO DEFENDANT'S**
**JOINT MOTION FOR A NEW TRIAL**

The United States opposes Defendant's Joint Motion for a New Trial. In support of this Opposition, the United States submits the accompanying Memorandum.

Respectfully submitted,

UNITED STATES OF AMERICA

ROBERT CLARK CORRENTE
United States Attorney

Craig Moore /lv
CRAIG N. MOORE
Assistant U.S. Attorney

Lee Vilker
LEE VILKER
Assistant U.S. Attorney

Dated: September 6, 2005

**CERTIFICATE OF SERVICE**

I, Paula Horsey, hereby certify that on this 6th day of September, 2005, I serviced by first-class mail a copy of the within Opposition To Defendant's Joint Motion For A New Trial on the following counsel of record:

John Tarantino, Esquire
Adler Pollock & Sheehan
1 Citizens Plaza, 8th Floor
Providence, Rhode Island 02903

C. Leonard O'Brien, Esquire
The Owen Building, 101 Dyer Street
Providence, Rhode Island 02903

Anthony Traini, Esquire
56 Pine Street
Providence, Rhode Island 02903

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR No. 03-81 ML (Superseding)** |
| | ) | |
| **NIGEL POTTER;** | ) | |
| **DANIEL BUCCI; and** | ) | |
| **BURRILLVILLE RACING ASSOCIATION** | ) | |
| **a/k/a LINCOLN PARK** | ) | |
| **a/k/a LINCOLN GREYHOUND PARK** | ) | |
| **a/k/a LINCOLN PARK, INC.** | ) | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S JOINT MOTION FOR A NEW TRIAL**

## *I. Introduction*

Defendants have filed a joint motion for a new trial. They make one claim – prosecutorial misconduct in closing and rebuttal argument. Their primary argument is that, in rebuttal, the prosecutor improperly told the jury there was evidence of guilt, which they were unaware of, that the Court had excluded. In addition, they contend that, in both closing and rebuttal, the prosecutor misrepresented the evidence and expressed his personal belief in and opinion of the strength of the government's case. The defense, in complaining about this conduct as well as other aspects of the trial, ascribes to the prosecutor scurrilous intentions and bad faith. For all the vituperative language in their memorandum, the defense made but one objection, only toward the very end of rebuttal, and the objection was promptly overruled. The record makes clear why – the prosecutor's argument, while aggressive, was proper, within the bounds of ethical advocacy, and fully supported by the evidence.

## *II. The Facts*

Trial began on July 19, 2005 and ended with a jury verdict on August 9 after approximately 10 days of evidence, 2 days of argument and 3 days of deliberation. The final arguments, which took place on August 3 and 4, are contained in 200 pages of transcript, including 58 pages of the prosecutor's closing and 12 pages of rebuttal – a total of about 70 pages and 1,775 lines. Defendants' 31-page memorandum alleges 10 instances of deliberate, willful, and unethical prosecutorial misconduct, comprising about 100 lines of transcript. The Court knows the facts of this case only too well and, rather than belabor them here for the sake of form, the Government will refer to the evidence only as necessary to respond to specific complaints made by Defendants.

## *III. Argument*

Defendants seem to divide their argument, for analytical purposes, into two parts. The first contends that the prosecutor improperly informed the jury of and asked for a guilty verdict based on evidence outside the record of which the prosecutor was aware. The second argues that the prosecutor misstated and mischaracterized the evidence and also stated his personal belief or opinion about the defendants' guilt. In their view, the first alleged error, by itself, requires a new trial and, in any event, the alleged errors collectively warrant that same relief. They are wrong.

### *A. The Applicable Law*

Under Rule 33 of the Federal Rules of Criminal Procedure, the Court may "[u]pon the defendant's motion … vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Such a motion is "directed to the trial court's discretion." ***United States v. Wright,*** 625 F.2d 1017, 1019 (1st Cir. 1980). In deciding it, "the court may weigh the evidence and consider the credibility of the witnesses." ***Id.*** The remedy of a new

trial, however, is "rarely used." ***United States v. Mooney,*** 315 F.3d 54, 61 (1st Cir. 2002). The trial court's decision is subject to review only for "a manifest abuse of discretion." ***United States v. Schneiderhan,*** 404 F.3d 73, 78 (1st Cir. 2005). And that abuse will be found "only if the verdict is so seriously mistaken, so clearly against the law or the evidence, as to constitute a miscarriage of justice." ***Stuart v. United States,*** 337 F.3d 31, 37 (1st Cir. 2003).

The Court should deny Defendants' motion for a new trial here for two (2) reasons. First, the prosecutor argued the case properly. Second, even if some of the statements were improper, it can not reasonably be said that they "so poisoned the well as to have likely affected the trial's outcome." ***Mooney,*** 315 F.3d at 60; ***United States v. Nelson-Rodriguez,*** 319 F.3d 12, 13 (1st Cir. 2003). That is because the misconduct, if any, was neither severe nor committed in bad faith, the prosecutor made the challenged remarks at the end of a long, hard-fought trial in reply to defense arguments, the Court gave an effective instruction to cure the impact of any improper comments, and the evidence against the defendants was strong enough to outweigh the possible impact of such comments on the jury. ***Id.*** This Court's determination on these matters is, of course, entitled on appellate review to "great deference … since the trial judge had the opportunity to listen to the tone of the argument as it was made, and was in a position to observe the effect that it had upon the jury." ***United States v. Turner,*** 892 F.2d 11, 12-13 (1st Cir. 1989). Stated simply, there was no error at all and, even if there were, it was also without any doubt at all harmless.

***B. The Prosecutor Fairly and Properly Argued in Rebuttal Against Defendants' Claims That Evidence Was "Missing" From the Government's Case***

In their closing arguments, all three (3) defense counsel repeatedly put to the jury questions about supposedly crucial evidence missing from the government's case. In no less than forty (40) instances they argued that there was no evidence about various matters or asked where that evidence was. ***See*** Potter Closing, Transcript ("Tr.") 8/3/05 at 64, 70, 78-80, 83, 94, 96, 111, 126, and 130; Bucci Closing, Tr. 8/4/05 at 5, 7-9, 14-15, 17-18, 21-22, 24, 27, and 30-36; and Lincoln Park Closing, Tr. 8/4/05 at 46-47, 66-68, and 71.

Among other things, the defense: 1) argued the absence of evidence on matters central to the case, e.g., "Where is the evidence…that" the bonus was really a bribe to John Harwood? Tr. 8/3/05 at 64; 2) suggested the government tried to hide evidence from the jury, "You'll notice this is one that is not a Government exhibit. They didn't give you this one." Tr. 8/4/05 at 18; and 3) asked the jury the nature of the McKinnon & Harwood partnership, something wholly immaterial to the charges in the indictment, and then told them, "the answer is you don't know, and the reason is that the Government gave you not one bit of evidence on the subject." Tr. 8/4/05 at 33. The arguments also referred to other persons not indicted and faxes not charged, as when one attorney told the jury about a fax that "went from Mr. Bucci to Mr. Potter to Mr. Hultman and discussed this dinner where this conspiracy was supposedly hatched; but Mr. Hultman is not charged as a conspirator in Count I and this fax is not charged as a crime in Count II." Tr. 8/4/05 at 7.

Despite the rhetoric in and tenor of their memorandum, the government did not inject into the trial the possibility of other evidence that would prove something to the jury. Quite to the contrary, the defense collectively fashioned a "missing evidence" argument and urged the

jury to find – precisely because such evidence was missing – that the government had failed to prove its case. The defense collectively asked the jury to speculate, and, based on that speculation, to find the defendants not guilty. They made these arguments without regard to whether they could have presented such evidence, whether such evidence existed, or whether, even if it did, the Court would have admitted it.

The government's rebuttal did not suggest to the jury that other evidence existed or that the Court refused to admit evidence that would prove the defendants guilty, something the courts have regularly found impermissible. ***See Kitchell v. United States,*** 354 F.2d 715, 719 (1st Cir. 1966) ( "Remarks on the availability of unused 'evidence' are clearly impermissible."); ***See also United States v. Somers***, 496 F.2d 723, 740 (3d Cir. 1974) (prosecutor's remark, made in objection to defense argument, improperly suggested that government was "aware of evidence, beyond that introduced at trial, implicating [the defendant].") The rebuttal here was, instead, exactly the opposite. Where the defense had tried to divert the jury's attention and invited them to speculate about evidence that was not before them, the prosecutor asked the jury to focus on the evidence the Court had admitted and decide the case according to the Court's instructions.

In making their arguments, Defendants' isolated five (5) lines of text from the rebuttal. Below is the full text of the relevant portion of the rebuttal:

> I also want to mention just briefly what the case is not about. It is not about who is not charged. It is not about what is not charged. It is not about, well, what didn't the government bring in. It's not about what the government didn't tell you. It is not about one line, in one exhibit, one line in another exhibit.
>
> It's not about any of that. Why? ***Because as the Court will instruct you, your job is to decide this case on this evidence, the evidence you've heard in this courtroom, and that's all, according to the law as the Court provides it.***
>
> If something's missing, if something isn't perfect, blame me. The government's not perfect. I'm not perfect. Maybe it could have been done better. Maybe there could have

> been something that I could have given you, brought in here. Maybe I could have brought something in that the Court would have allowed in that didn't come in.
>
> ***I brought you the evidence as we have it. I put it before you and that's what you have to work with, that and what the defense put on and what the Court instructs you about.*** And in that regard, I want to discuss a couple pieces of the evidence... .

Tr. 8/4/05 at 72 – 73 (Emphasis added).

The language that the defense finds so offensive was a far cry from asking the jury to consider information not before them. And it most certainly was not a sorrowful plea from a prosecutor trying to save a lost case. The argument, if somewhat imprecise, was to tell the jury that its job was to decide the case based on the evidence in Court. In effect, the reply to questions and arguments posed by the defense about all that "missing evidence" was, "So what? Look at the evidence we have."

The challenged argument here was not all that different from the one in ***United States v. Suttiswad***, 696 F.2d 645, 652-53 (9th Cir. 1983). In that case, the Court ruled there was no error in the prosecutor's reply to a defense argument about the government's failure to obtain fingerprints from the false lining of a suitcase. In rebuttal, the prosecutor actually told the jury that the government might actually have had the very specific, highly incriminating and missing evidence the defense had highlighted:

> If we had fingerprints, we might have more defendants in here. Maybe we have the defendant's fingerprints, but that's not part of what you should consider. Consider that a diversion.

696 F.2d at 652-53.

The Court affirmed, stating that "the prosecutor's comment was only fair rebuttal to counsel's argument concerning the missing [evidence]" and it found "no sinister connotation in these remarks." ***Id.*** at 653. The reason, of course, is that the prosecutor was not even remotely

trying to tell the jury that there was "other evidence" he knew about and that they could rest easy if they found the defendant guilty. To the contrary, picking up the thread of the defense argument about the 'missing evidence,' the prosecutor simply told the jury to ignore it. The same is true here.

Moreover, the prosecutor couched the challenged remarks between two explicit statements to the jury that it's job was to follow the Court's instructions and decide the case based on the evidence before it. To the extent the challenged statements may have suggested otherwise, "the prosecutor's own comments went a long way toward curing any [such] understanding." ***United States v. Gonzalez-Gonzalez,*** 136 F.3d 6, 9 (1st Cir. 1998) (any error caused when prosecutor incorrectly defined 'reasonable doubt' mitigated by his emphasis that the Court would instruct the jury about it and they should follow the Court's instructions).

Defendants contend that the prosecutor exacerbated the alleged problem when he stated near the end of his rebuttal that, "We have brought before you the evidence as we have it," and then added, "the evidence as the Court has allowed it." Tr. 8/4/05 at 83. Defendants complain that, again, the prosecutor "suggest[ed] … that there was other evidence that the Court had not allowed." Defendants' Memorandum at 4. There was no one in the courtroom who did not know 'there was other evidence that the Court had not allowed.' To state that is only to state the obvious. Indeed, as the Court knows, it routinely instructs the jury – and so instructed them here – precisely, that evidence is only what the Court allows to be admitted. If not allowed, it is not evidence. Jurors are instructed to disregard questions, answers that may have been stricken, and documents not admitted. As to documents, of course, the jury was completely unaware of the content and never saw them. There is no reason whatsoever to believe that the jury speculated about such information and, in any event, the issue does not turn on whether there was other

evidence or not. The critical question is what, if anything, the prosecutor may have asked the jury to do with it. Here, the answer is, absolutely nothing.

Under these circumstances, it is not at all improper for a prosecutor to refer to "admissible evidence." The Ninth Circuit made the point in ***United States v. Schuler,*** 813 F.2d 978, 982 (9th Cir. 1987). There, the prosecutor "told the jury several times that it had received the 'admissible' evidence." ***Id.*** The prosecutor had responded to an argument by the defense to the effect that the government had not wanted the jury to hear certain evidence, specifically, testimony from a particular witness. The Court ruled that there was no error, stating that there was "no indication that [the defendant] was prejudiced by the prosecutor's comment that the jury had received all admissible evidence, especially in light of defense counsel's rhetorical questions to the jury concerning the lack of testimony . . . ." ***Id.***

The prosecutor's argument is to be reviewed "not in sterile isolation, but within the framework and context of the actual trial." ***United States v. Nickens,*** 955 F.2d 112, 121 (1st Cir. 1992). In particular, the rebuttal and its effect must be evaluated in light of the defense argument that prompted it. ***Id.*** As the Supreme Court has explained it, "if the prosecutor's remarks were 'invited' and did no more that respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." ***United States v. Young,*** 470 U.S. 1, 12-13 (1985); ***United States v. Henderson,*** 320 F.3d 92, 107 (1st Cir. 2003). That is precisely what happened here. When the other factors bearing on the permissibility and potential impact of the argument are weighed, there is no reasonable basis to grant a new trial. The Court gave an immediate and effective curative instruction and also instructed the jury that arguments of counsel were not evidence. The government presented a strong, albeit circumstantial, case against the defendants. And any doubt that the verdict may have somehow been influenced by any improper argument is

removed by the jury's acquittal of each of the defendants on two (2) of the counts with which each was charged. ***See United States v. Bankston,*** 182 F.3d 296, 313 (5th Cir. 1999).

### *C. The Prosecutor Did Not Misstate the Evidence Or Improperly Place his Personal Credibility Before the Jury And Any Mistakes The Prosecutor May Have Made Were Harmless In Any Event*

As "further considerations," Defendants argue that the prosecutor improperly mischaracterized the evidence and injected his personal beliefs into the trial during closing and rebuttal arguments. Even a cursory reading of the arguments makes it clear that they were wholly proper and based on the evidence. A careful analysis makes it even more clear.

Defendants' chief argument is that the Government mischaracterized the evidence when it argued that defendant Potter concealed critical information concerning the proposed payments from the myriad of witnesses called in this case. Far from being a mischaracterization, the evidence introduced at trial was striking in its consistency as to defendant's Potter failure to divulge critical information to pertinent witnesses. Defendant Potter called witness after witness who testified that they were informed of some aspect of the plan to pay Mr. McKinnon some additional amount of money. Yet, cross-examination revealed that none of these witnesses were informed of the two most important aspects of this plan: 1) that the payments could amount to millions of dollars over a period of years and 2) that they were specifically linked to the number of video lottery machines approved by the Rhode Island State Government.

In particular, defense witness Robert Goldman testified that Mr. Potter never even told him about the partner of the lawyer to whom the proposed bonus was to be paid. Tr., 8/2 at 7. Attorney Nicholas Casiello testified that Mr. Potter only mentioned the sum of $500,000, that he did not mention that payments could amount to $4,000,000 or that the proposed payment structure would be $500,000 for two years followed by a million dollars for the next three years.

Tr., 8/2 at 18. Auditor Ian Wilkie similarly testified that Mr. Potter never told him that the potential payment could amount to $4 million, that the structure of the payments would be $500,000 for two years followed by $1,000,000 for three years, or that the payments "were conditioned upon or dependent upon Lincoln Park being granted additional VLT machines." Tr. 8/2 at 55. Wembley PLC Board member Neil Chisman was very clear that Mr. Potter had never told him anything concerning the size of the potential payments of the linkage to more machines:

> Q: My question, Mr. Chisman, were you ever told by Mr. Potter that the payments, the possible payment structure to Dan McKinnon included payments of $1 million per year for 2003, 2004 and 2005?
>
> A: No.
>
> Q: Were you ever told that there was any link between the amount of payments and receipt of permission to install at least 1,000 extra VLT or slot machines?
>
> A: No.

Tr., 7/28 at 146. And, despite Defendants' mischaracterization of his testimony, PLC Board member Peter Harris also testified that he was never told that the amount of the payments could total $4 million or that they were linked to a political result:

> Q: So, you were not aware, this is a numbers question, you were not aware of the possibility being discussed of paying McKinnon & Harwood $500,000 for 2001 and 2002 and then an additional $1 million for each of 2003, 2004, 2005? You were not aware of that being the structure?
>
> A: No
>
> . . . . . .
>
> Q: So at the time the budget was approved, you had no idea, did you not – you had no idea, did you, that the amount of payments possibly going to Mr. McKinnon depended on the achievement of additional machines at Lincoln Park?
>
> A: At that stage, I do not believe I knew that.

Tr. 8/2 at 134, 136.

Based on all of this evidence, it was perfectly permissible for the Government to argue in closing that Mr. Potter had concealed the key aspects of the proposed payments to the individuals who managed, audited and advised Wembley PLC. It was the defense who raised this issue by calling the above witnesses to testify concerning the disclosures made to them by Mr. Potter concerning the proposed payments to McKinnon & Harwood. When each and every one of these witnesses admitted on cross-examination that they had never been informed of critical aspects of the proposed payments to McKinnon and Harwood, the Government was certainly well within its right to argue that fact to the jury.

It is true, as the defense notes, that Mr. Potter provided the details of the proposed payments to Messrs. Sherman and Brents during the January 24, 2001 Wembley USA Board meeting. According to the testimony of these witnesses, Mr. Potter made these disclosures only when he stated that the PLC Board had approved the payments and that it was a "done deal." When the Government argued in closing that Mr. Potter had concealed the payment structure from everybody, it was clear from the context of those remarks that the Government was referring to the myriad of defense witnesses from whom Mr. Potter supposedly sought advice on behalf of Wembley PLC.

Defendants also claim that the Government mischaracterized the evidence when it discussed in closing whether multi-million dollar bonuses to attorneys were "common business practices" in Rhode Island. These remarks were based directly on evidence introduced during trial, namely, Government's Exhibit 40, in which Mr. Bucci wrote: "To delay an incentive simply validates the feeling that pervades about Wembley, i.e. that the company is ungrateful, impersonal, greedy and is unwilling to participate in ***common business practices.***" (Emphasis

added.) With that document, it was completely proper for the Government to offers its interpretation of what Mr. Bucci meant when he referred to "common business practices." While the defense may interpret this phrase differently, that in no way can mean that the Government is precluded from arguing to the jury that it has a different – and more sinister – meaning. The Government did nothing more than ask the jury to draw upon its common sense in considering whether a million dollar bonus to an attorney was a common business practice or whether such a large payment was evidence of a political payoff.

The defendants' remaining examples of purported Government misrepresentations are similarly without merit. For example, the defense claims the Government mischaracterized the evidence when it argued that "if that showed up in the front page of the paper, everyone would know what it was." Tr. 8/3/05 at 51:19-21. This remark was in direct response to the testimony of defense witness Mark Elliott, who testified that "[o]ne director said, 'I wouldn't want to be embarrassed if we made a payment like this and it appears on the front page of the Daily Express'." Tr., 7/29 at 22. Remarkably, the defense also objects to the Government's argument that "that's how these things are done, Ladies and Gentlemen, with a wink and a nod and a knowing look, talking in code perhaps." Tr., 8/4/05 at 82:3-6. This argument was again directly linked to evidence introduced at trial, namely the repeated references made by Mr. Bucci that "a wink is as good as good as a nod to a blind man." See Government Exhibits 17 and 24.

Not every incorrect statement about the evidence amounts to "misconduct," much less "bad faith." It is not unusual in a trial like the one here for any lawyer to make misstatements "involv[ing] reasonable inferences that the [lawyer] ... asked the jury to draw from the facts ... [that] ... were de minimus and did not stray far enough from the actual testimony to indicate prejudice or bad faith." ***United States v. Wilkerson,*** 411 F.3d 1, 9 (1st Cir. 2005). Nor does

every expression of confidence in the evidence or statement of assurance to the jury that the evidence establishes certain facts amount to an improper statement of personal opinion.

In ***United States v. Henderson,*** 320 F.3d 92, the First Circuit examined defense claims similar to those made here in a common sense fashion, with a practical understanding of what occurs in a difficult trial. ***Henderson*** involved drug charges based on sales to an undercover law enforcement officer. Counsel on both sides made vigorous and even aggressive arguments. On appeal, the defense claimed that the prosecutor had repeatedly expressed his personal opinions about the witnesses, the evidence, and what the result should be. The Court ruled to the contrary. In doing so, the Court examined assertions that, standing alone, might seem to be improper. When considered in context, however, they amounted only to hard but proper advocacy.

For example, the prosecutor asked the jury to examine the evidence with a "stern and suspicious eye. And if you do that, ***you'll have no doubt*** that the government has sustained its burden." ***Id.*** at 106 (emphasis added). Similarly, the prosecutor told the jury that "if you ask the right questions in this case, ***there's no doubt*** but that their clients will be convicted." ***Id.*** (emphasis added). In affirming the conviction, the Court observed that the prosecutor has a right to argue " that the government's theory of the case did a better job of focusing on the evidence," or that Defendants' theory "directed the jury to the 'wrong' questions, whereas the government's theory directed it to the 'right' questions ... presumably ... based on the evidence." ***Id.*** That is no less true in this case.

Even if the prosecutor's remarks can be said to have crossed permissible boundaries, that alone plainly did not sway the jury. Indeed, especially in a case such as this, the First Circuit has made clear that "[the occasional oblique expressions of opinion from both sides against the

background of a long trial, much evidence on the issue, and lengthy argument addressed to the evidence could not loom sufficiently large to have influence." ***Patriarca v. United States,*** 402 F.2d 314, 322 (1st Cir. 1968).

## *IV. Conclusion*

As in ***Henderson***, the prosecutor here did nothing more than tell the jury pointedly that it should look at all the evidence in the case, all of the faxes, every word, start to finish, and that doing so would leave absolutely no doubt about the defendants' guilt, "properly direct[ing] the jury's attention to the evidence presented at trial." ***Id.*** It is, in the words of the First Circuit, difficult to see how such remarks "would distract the jury from focusing on whether the evidence established guilt beyond a reasonable doubt." ***Id.*** The Government carefully tailored its remarks to the evidence that was admitted during the trial. The prosecutor's arguments addressed that evidence and the reasonable inferences that could be drawn from it. The jury returned a fair and impartial verdict on that same evidence. And there is absolutely no reason for this Court to reach any other result.

Respectfully submitted,

UNITED STATES OF AMERICA

ROBERT CLARK CORRENTE
United States Attorney

Craig Moore /lv
CRAIG N. MOORE
Assistant U.S. Attorney

Lee Vilker
LEE VILKER
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I, Paula Harvey, hereby certify that on this 6th day of September, 2005, I serviced by first-class mail a copy of the within Memorandum In Opposition To Defendant's Joint Motion For A New Trial on the following counsel of record:

John Tarantino, Esquire
Adler Pollock & Sheehan
1 Citizens Plaza, 8th Floor
Providence, Rhode Island 02903

C. Leonard O'Brien, Esquire
The Owen Building, 101 Dyer Street
Providence, Rhode Island 02903

Anthony Traini, Esquire
56 Pine Street
Providence, Rhode Island 02903