IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| VS. | : | CR. No. 03-81 ML (Superseding) |
| | : | |
| NIGEL POTTER; | : | |
| DANIEL BUCCI; and | : | |
| BURRIVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK | : | |
| a/k/a LINCOLN GREYHOUND PARK | : | |
| a/k/a LINCOLN PARK, INC. | : | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR NEW TRIAL**

## INTRODUCTION

First, all of the cases cited by the government in its opposition memorandum either support the Defendants' position or are easily distinguishable, factually or otherwise, from the circumstances present here.[1] Second, while the standard of review in Rule 33 cases is well-established, it is important to note that in considering how to assess prosecutorial misconduct when weighed against the strength of the government's case, the First Circuit Court of Appeals has stated:

> In making this *post hoc* judgment, a crucial factor is the weight of the evidence of the defendants' guilt or innocence. *See United States v. Santana-Camacho,* 833 F.2d 371, 373-74 (1st Cir.1987). We do not in such a case take the evidence in the light most favorable to the government or assume that credibility issues were resolved in its favor. The jury may well have decided the issues in favor of the

[1]For example, the government's citation to United States v. Mooney, 315 F.3d 54, 61 (1st Cir. 2002) is not important for the excerpt quoted, but rather for the fact that Mooney also states that "[w]e acknowledge that several incidents of prosecutorial misconduct, none of which individually would require reversal, taken together may have a cumulative effect that warrants a mistrial", citing United States v. Wihbey, 75 F.3d 761, 773 (1st Cir. 1996). Id., at 60. Even more importantly, in Mooney the trial lasted only 4 days, "the comments occurred during opening arguments, not during summation where the last words the jury hears have significant potential to cause prejudice" (and therefore the context weighed against finding that the remarks affected the outcome of the trial in a case where the evidence was overwhelming). Id. (emphasis added)

> government, but that jury decision may itself be tainted by the improper remarks. Thus we will look at the evidence as a whole and, despite the lack of objection, we will reverse if the error is manifest and if there is a substantial chance that absent the error the jury would have acquitted.

Arrieta-Agressot v. United States, 3 F.3d 525, 528 (1st Cir. 1993) (emphasis supplied).[2]

## ARGUMENT

### 1. Lack of Evidence v. Missing Evidence

The government mischaracterizes the legal issue before the Court and also demonstrates a fundamental misunderstanding of the constitutional requirements of federal trial practice. The government states that:

> The defense collectively fashioned a "missing evidence" argument and urged the jury to find – precisely because such evidence was missing – that the government had failed to prove its case. The defense collectively asked the jury to speculate, and, based on that speculation, to find the defendants not guilty. They made these arguments without regard to whether they could have presented such evidence, whether such evidence existed, or whether, even if it did, the Court would have admitted it.

Government's Memorandum In Opposition To Defendants' Joint Motion For A New Trial (hereinafter GM) at 4-5.

First, the government has attempted through a combination of legal alchemy and *ipse dixit* to transform a ***lack of*** evidence argument into a ***missing*** evidence argument.[3] However, the Defendants never argued that there was "missing evidence" in the case and that the jury should

---

[2]Defendants rely upon and incorporate by reference herein the arguments made in their various filings and oral presentations before the Court in support of their several motions for judgment of acquittal pursuant to F.R.Crim.P. 29. While the standard of review is more stringent for Rule 29 motions, the reference to those motions here is made merely to incorporate the arguments concerning the weakness of the government's case and not to suggest that this evidence (or lack thereof) should be judged here by the Rule 29 standard. To the contrary, the arguments made here are specifically to be judged according to the Rule 33 standard.

[3]Acknowledging the government's effort to force the much larger failure to meet the burden of proof into the considerably smaller container of a mere "missing evidence" context, immediately distinguishes several cases on which the government relies, including United States v. Suttiswad, 696 F.2d 645, 652-653 (9th Cir. 1983); United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987); and United States v. Henderson, 320 F.3d 92, 107 (1st Cir.), cert.denied, 539 U.S. 936 (2003).

rely on the fact that it was missing and thus acquit. Rather, the Defendants argued, as made clear from the respective summations, that the government's case suffered from a lack of evidence; a ***failure*** of evidence on the legal principles that were about to be announced by the Court in jury instructions, and consequently that the government had not met its burden of proof.

Second, the government's mischaracterization of the defense arguments as being about "missing evidence" and having been made "without regard to whether they [the defendants] could have presented such evidence" is not only an incorrect statement of the legal issue, but also demonstrates a complete lack of understanding of the principles of burden of proof in a criminal case.[4] The constitutional framework within which criminal cases are prosecuted is as follows: (a) the government, solely and completely, shoulders the burden of proof as to each and every element of the offense, and this burden never shifts to the defendant under any circumstances, United States v. Olmstead, 832 F.2d 642, 646 (1st Cir. 1987), cert. denied, 486 U.S. 1009 (1988); (b) whether the government likes it or not, a defendant gets to call to the jury's attention that the government has failed to carry this burden by specifically (or otherwise) telling the jury that the government has failed to produce evidence necessary to support its allegations or to clear the hurdles of jury instructions on particular points of law; and (c) whether the government likes it or not, the government cannot rebut that argument by telling the jury to blame the prosecution for failing to introduce the evidence necessary to meet the government's burden and inviting the jury to speculate that perhaps there was other evidence that the Court may have allowed. Most troublesome in this regard is the government's attempt to justify the prosecutor's improper comments with the remarkable statements that "There was no one in the courtroom who did not

---

[4]Even in a legitimate "missing evidence" situation, the defendant may take the government to task for its investigative or other failure to locate and submit an identifiable item of evidentiary value without thereby shifting the burden to himself of having to explain why he [the defendant] did not produce it. See, e.g., United States v. Roberts, 119 F.3d 1006, 1016 (1st Cir. 1997). Compare United States v. Schuler, supra.

know 'there was other evidence that the Court had not allowed.' To state that is only to state the obvious." (GM at 5). It is both astonishing and disturbing that the government continues to suggest that it is permissible to direct the jury's attention to other evidence the Court had not allowed, even after this Court has ruled that such comments were wholly improper.[5]

Third, the government claims that it cured any error in its rebuttal argument by telling the jury to focus only on the evidence admitted (GM at 7). Unfortunately, the portion of the prosecutor's argument on which the government relies for this proposition is itself incorrect.[6] The prosecutor told the jurors that they were to decide the case "on this evidence, the evidence you've heard in this courtroom, and that's all," (Tr. 8/4/05 at 73:3-5), and "I brought you the evidence as we have it. I put it before you and that's what you have to work with," (Id., at 73:14-15). This was, however, not all the jury had to work with. As this Court instructed the jury, "A reasonable doubt may arise not only from the evidence produced but also from a **lack of evidence**." (Id., at 98:4-6 (emphasis added)). The prosecutor did not "cure" his own "error;" rather, he exacerbated it by directing the jury's attention away from the truly critical factor—the lack of (as opposed to "missing") evidence which caused the government to fail to meet its burden of proof. The First Circuit addressed a similar situation in United States v. Roberts, 119 F.3d 1006, 1015-1016 (1st Cir. 1997). There the Court considered the same type of issue raised here and reversed the convictions for this reason (*i.e.,* the prosecutor also referred to evidence not in the record. Id., at 1015). As the Court stated:

[5]The government's statement (GM at 5) that its "rebuttal did not suggest to the jury that other evidence existed or that the Court refused to admit evidence that would prove the defendants guilty" is belied and directly contradicted by the trial transcript. Tr. 8/4/05 at 73:7-13; *see also* 89:15-24.

[6]The government's reliance on United States v. Gonzalez-Gonzalez, 136 F.3d 6, 9 (1st Cir.), cert.denied, 524 U.S. 910 (1998) is misplaced. In Gonzalez-Gonzalez, the prosecutor's "comment" was an incorrect definition of reasonable doubt and the defendant conceded that the reasonable doubt instruction the Court actually gave the jury was a correct statement of the law.

> Being fair in fact is commendable. But parading an appearance of fairness by calling attention to things not to be considered by the jury is a dubious tactic in any setting. It is certainly not permissible when the way it is carried through-by pointing out the prohibited comments in order to warn the jury of their forbidden nature-tends to implant in the minds of jurors the very things forbidden, by saying they are things the jury must think about in order to remember not to think about them.
>
> Id., at 1015-1016.

2. The Inapplicable Fair Reply Doctrine

The government argues that the prosecutor's rebuttal argument was permitted by the so-called doctrine of fair reply, citing United States v. Young, 470 U.S. 1, 12-13 (1985).[7] The Defendants did not invite a response that "maybe there was evidence the Court would have allowed." The Defendants argued, quite appropriately, that there was a lack of evidence and that lack of evidence created reasonable doubt. Additionally, although Young establishes the invited response doctrine, it makes two additional and important points. First, if the prosecutor's remarks exceed permissible bounds the court can reverse and grant a new trial if it concludes the error was not harmless.[8] Second, Young suggests that the better way to have dealt with the

---

[7]The government also cites United States v. Nickens, 955 F.2d 112, 121 (1st Cir.), cert.denied, 506 U.S. 835 (1992). Nickens was the classic invited response case and the quoted excerpts from the trial transcripts in Nickens thoroughly distinguish it from the present case.

[8] First, this particular point demonstrates the true significance of one of the government's citations, United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987), supra fn. 3. What was really important about Schuler is the further improper remark by the prosecutor (a comment on the defendant's failure to testify) that caused the conviction to be reversed. The basis for the court's holding that it could not find that this statement was not harmless error was because there had been a hung jury in the previous trial.

Second, the government's suggestion that it "presented a strong, albeit circumstantial case against the defendants" is factually incorrect, if not disingenuous. The government admitted in open court and on the record that the case was a close one and that it needed certain evidence (which the court excluded) this time in order to convict the defendants and that the Court's refusal to admit this evidence in the last trial is what caused the hung jury. Tr. 7/20/05 at 128:21; 129:2; 129:10-11; 129:16-19.

Third, the government's claim that the acquittals on several substantive counts shows that the jury was not influenced by the improper comments is devoid of merit. In fact, the opposite conclusion is supported by the fact that the question the jury asked immediately before it convicted the defendants demonstrates that they heard exactly what the prosecutor wanted them to hear in his improper comments. Tr. 8/8/05 at 2:2-8. In any event, attempting to discern the jury's thought process and then use such speculative conclusions to support a legal argument would be rejected out of hand if a defendant suggested it. The government should be treated no differently. And its reliance

situation there was for the trial judge to have stopped defense counsel so the prosecutor would not have felt compelled to rebut what he said.[9] Here, the defense arguments were proper and consistent with the Court's instructions. The prosecutor's arguments were improper and contrary to the Court's instructions.

3. Mischaracterizations of Evidence.

The government asserts that its rebuttal argument was accurate because "none of [the defense] witnesses" was informed that the McKinnon proposal was "specifically linked to the number of VLT machines approved by the Rhode Island State government." GM, at 9. The government also insists that the prosecutor did no more than comment fairly on the evidence. Id. at 11-12. These assertions are not accurate.

First, the government's rebuttal argument did not assert that Mr. Potter concealed the terms of the McKinnon proposal only from the defense witnesses. Rather, the government claimed that he concealed these terms "from everybody, ***from everybody***." Tr. 8/4/05 at 75:10-16 (emphasis supplied). "Everybody" had to include Mr. Sherman and Mr. Brents, not only because of the word's plain-English definition, but also because the prosecutor himself used the term "everybody" moments later in his rebuttal to refer specifically to Mr. Sherman and Mr. Brents. Tr. 8/4/05 at 77:13-25 – 78:1.

---

*(footnote 8 continued)*
on United States v. Bankston, 182 F.3d 296, 313 (5th Cir. 1999), bizarrely extends the reach to which the government goes in misinterpreting the jury verdict in its effort to justify its own actions. In Bankston, the acquittal was material because the prosecutor's offending remark was directed to defendant Rayburn in response to a specific comment by Rayburn's counsel. Rayburn was acquitted. It was the other defendants who were complaining about the remark.

[9] Here, the government argues that the prosecutor's remarks were directed to closing remarks by defense counsel, and cites specifically to certain statements made by defendant Bucci's counsel. According to the Young rationale, the Court should have sua sponte stopped defense counsel; however, there was nothing objectionable about the defense remarks (Tr. 8/4/05 at 32:12-35:13) because they were based on jury instructions which the Court told counsel she would (and actually did) give (Tr. Id. at 116:13 – 117:3). Furthermore, counsel advised the Court two days before final arguments that these would be jury issues (during the Rule 29 hearings) (Tr. 8/2/05 at 201:19 – 209:14), and no objection was posed by the government.

In fact, as the government concedes (GM, at 11), Mr. Potter did disclose all of these details to both Mr. Sherman and Mr. Brents in a setting (the January 24, 2001 WUSA meeting) in which he knew these details would be memorialized in writing by the two people he knew were most opposed to the proposal. Tr. 7/20/05 at 75:16-19; Tr. 7/25/05 at 38:16-25; *Government Exhibit 51(b).*

This government argument was particularly unfair because it was followed up by a reference to *Government Exhibit 107,* in which Mr. Bucci wrote in April, 2001 that "I don't want Denver to know our business." Tr. 8/4/05 at 77:14-25 – 78:1. The prosecutor used this exhibit to buttress an argument that Mr. Potter and Mr. Bucci conspired to keep Mr. Sherman and Mr. Brents in the dark, even though the evidence was uncontradicted that they did not do anything of the sort:

- Mr. Potter disclosed the very details that the government says it considers most crucial to both Mr. Sherman and Mr. Brents in January, 2001 at the WUSA meeting;

- Mr. Bucci protested vigorously on February 15, 2001, after Mr. Potter had left his post due to illness, that he did not want Mr. Potter's successor in London to cut Denver out of the financial loop, but rather that he specifically wanted to continue as they had always done, *i.e.,* "Skip [Sherman] approves everything over $5,000." *Bucci Exhibit H.*

- The exhibit to which the government drew the jury's attention in an effort to prove otherwise, *Government Exhibit 107,* was outside the time frame relevant to Mr. Potter, was not admitted against Mr. Potter and had nothing whatever to do with the relationship between these two men.

Second, Mr. Potter did not conceal the link between the proposed McKinnon payment and VLTs from all the defense witnesses. Mr. Casiello testified to the direct contrary: "He [Nigel Potter] said that Lincoln Park wanted to get the approvals necessary to increase the number of gaming machines at Lincoln Park. He said that they used a law firm, Rhode Island

law firm by the name of McKinnon and Harwood, ... and that they were considering paying some sort of retainer or success fee to that firm." Tr. 8/2 at 11:13-25; 12:1-2. In other words, Mr. Potter told Mr. Casiello that Lincoln Park was using McKinnon and Harwood to try to get more VLT's and that they were considering paying the firm a "success fee" in relation to those efforts, *i.e.,* a fee "specifically linked to the number of video lottery machines approved by the Rhode Island State Government" (GM, at 9) because it was based on the firm's success or lack of success in gaining VLT's. Id.

Third, the Government insists that, because it presented evidence that Mr. Bucci wanted Wembley to participate in "common business practices," it was fair comment for the prosecutor to assert that attorneys in Rhode Island do not get million dollar bonuses. GM, at 11-12. The government insists as well that it had the right to interpret the phrase "a wink is as good as a nod" by asserting that "that's how these things are done, Ladies and Gentlemen, with a wink and a nod and a knowing look, talking in code perhaps." Id. at 12.

These assertions are not interpretations of the evidence. They are assertions of official opinion camouflaged as fact:

- The government presented not a particle of evidence that Rhode Island attorneys are not paid million dollar bonuses. The evidence was all to the contrary. According to both government evidence (*e.g., Government Exhibit 17*) and defense evidence (*e.g.,* Tr. 7/27/05 at 52-54), local attorneys in the gaming field *have* been paid million dollar bonuses and fees.

- The government presented not a particle of evidence concerning "how these things are done." The question for the jury was what Mr. Bucci meant, and what Nigel Potter understood, by the phrase "a wink is as good as a nod." Absent evidence that either Mr. Potter or Mr. Bucci knew about these other contexts and was adopting them here, the prosecutor's assertion that these words, or their ilk, mean bribery in other contexts was grossly improper.

These arguments are dangerous and damaging precisely because they sound something like the evidence, even though they are nothing more than allegations of unproven fact. They are

uniquely prejudicial as well because they come from the United States government representative, the prosecutor, to whom jurors will tend to assign a high degree of credibility.

4. The Accuracy of the Transcript and the Tape Recording.

The Defendants have suggested in their original filing that there is a discrepancy in the trial transcript of the prosecutor's remarks that may require action by the Court. (See Memorandum of Law In Support Of Defendants' Joint Motion For New Trial, at pp. 2-4, fns. 3, 5. [hereinafter Defense Memo]). Although the government has ignored this issue in its response, the matter may nevertheless have to be addressed.

To the extent that the Court should find that the Defendants are entitled to relief on the basis of the "official" transcript of the prosecutor's remarks, the discrepancy issue is moot. Likewise, to the extent that this Court determines that even if the prosecutor's remarks were actually as reported in the "real time" transcript and as recalled by defense counsel (see affidavits attached to Defense Memo), the Defendants are not entitled to relief, the issue is again moot.[10]

However, should the Court determine that the "real time" version of the prosecutor's statement would entitle the Defendants to relief if in fact that version of the transcript were found to be accurate, the Defendants request that the Court (a) make a specific finding to that effect and (b) allow the Defendants the opportunity for an evidentiary hearing on the issue of the accuracy of the transcript.[11]

---

[10] In the event the Court makes a determination that the remarks as recorded in the "real time" transcript are essentially immaterial in that the Defendants would not be entitled to relief even if the prosecutor made the statements there attributed to him, Defendants respectfully request that the Court make a specific finding to this effect for purposes of appellate review.

[11] The Defendants further request, regardless of whether the Court grants the request for an evidentiary hearing, that the Court order (a) the segregation and preservation of the tape recording(s) (as originally requested in the Defendants' original filing), and (b) that the stenographer submit to the Court to be sealed and segregated with the tape her notes, whether paper or paperless (i.e., on disk) of the transcript of August 4, 2005, as well as any notes or other materials she received or exchanged with the "scopist" or other individual who reviewed the tape recording in connection with any changes that were made to the transcript.

## CONCLUSION

The government's closing reference to Patriarca v. United States, 402 F.2d 314, 322 (1st Cir. 1968), cert.denied, 393 U.S. 1022 (1969) is noteworthy for two points. First, Patriarca criticizes, if not disparages the invited response doctrine (402 F.2d at 321, fn. 6). Second, Patriarca states "[p]rosecuting attorneys and law enforcement officials wear an invisible cloak of credibility by virtue of their position; to make it explicit may too easily tip the scales." (Id., at 321). After restating the oft-quoted passage from Berger v. United States, 295 U.S. 78, 88 (1935) concerning the responsibility of all federal prosecutors, the First Circuit pointed out in United States v. Manning, 23 F.3d 570, 575-576 (1st Cir. 1994):

> For the third time in the last six months, we find ourselves in the regrettable position of vacating a conviction because a United States Attorney has failed to honor sufficiently these precepts. *See Udechukwu,* 11 F.3d at 1106; *Arrieta-Agressot,* 3 F.3d at 530; *see also United States v. Moreno,* 991 F.2d 943, 949-50 (1st Cir.) (Torruella, J., dissenting) (arguing, *inter alia,* that the prosecutorial misconduct in that case warranted reversal of defendant's conviction), *cert. denied,* 510 U.S. 971, 114 S.Ct. 457, 126 L.Ed.2d 389 (1993).

Unfortunately, this Court is in the same "regrettable position" today. The Defendants were all prejudiced by the government's improper rebuttal arguments. The Defendants are entitled to the relief sought and a new trial should be granted.[12]

## REQUEST FOR ORAL HEARING

Pursuant to L.R. 12(b), the Defendants respectfully request oral argument on the within motion. The issues raised herein are of significant importance to the Defendants' rights to a fair trial as well as to the standards of criminal trial practice in this Court. See, United States v. Manning, supra.

[12] In addition to joining in the Defendants' Joint Motion For New Trial, Defendant LPRI, LLC, f/k/a Lincoln Park, Inc., filed a separate additional Motion For New Trial. The government has not filed a memorandum in opposition to that motion, and Defendant LPRI, LLC submits its individual motion should be granted.

Dated: September 13, 2005

Respectfully submitted,
DANIEL BUCCI,
By his Attorney,

Anthony M. Traini (#4793)
56 Pine Street - Suite 2
Providence, RI 02903
Tel. 401.621.4700
Fax 401.621.5888

NIGEL POTTER,
By his Attorney,

s/ C Leonard O'Brien

C. Leonard O'Brien (#1886)
B. Jean Rosiello (#2886)
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903
Tel. 401.751.5090
Fax 401.751.5096

LPRI, LLC f/k/a LINCOLN PARK, INC.,
By its Attorneys,

John A. Tarantino (#2586)
Patricia K. Rocha (#2793)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel. 401.274.7200
Fax 401.351.4607

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2005, I served a copy of the foregoing pleading by hand delivery upon Lee H. Vilker, Esquire, Assistant United States Attorney, United States Attorney's Office, The Fleet Center, 50 Kennedy Plaza, Providence, RI 02903.

Debra Hamm